1. **Abbott Illegally Promotes the Depakote® Products Using the Failed Tariot 738 Study in Support of Off-Label Use**

173.    As part of the Fraudulent Marketing Scheme, Abbott funded a placebo-controlled randomized study, M97-738 (the "738 Study"), which, if favorable, the company had planned to use in its application with the FDA for approval to promote the Depakote® Products for mania associated with dementia. Rather than wait for the final results and FDA approval, however, Abbott began promoting the results in advance. There was so much excitement about the 738 Study in Abbott's Marketing Department and its potential to support the use of the Depakote® Products to treat mania associated with dementia that Abbott disseminated an internal publication to the LTC Sales Force called the "738 Update" (referring to the 738 Study), discussing the progress of the study.

174.    To facilitate the 738 Study, Abbott dispatched its team of Neuroscience Medical Liaisons ("MSLs") to visit all the nursing home clinical sites to conduct in-services with the staff and "further educate everyone on Depakote and its role in elderly demented patients. . . ." These presentations were off-label.

175.    The principal investigator, Dr. Pierre Tariot (a paid Abbott consultant from the University of Rochester), who would lead the efforts for the 738 Study, announced the preliminary results of the Abbott-funded trials at a media briefing during the 6th International Conference on Alzheimer's Disease and Related Disorders in Amsterdam, the Netherlands on July 21, 1998. According to the press release of the study results, "[m]edicines commonly used to treat epilepsy and other seizure disorders appear to be effective at soothing the agitation in people with Alzheimer's disease and other forms of dementia." The press release, prepared by Abbott, quotes Dr. Tariot as saying that the medicines appear to be "as good as or better than the medicines physicians have available now to treat agitation." His co-presenter, Dr. Anton

61

Porsteinsson (also a paid Abbott consultant) explained that "[t]his is a case where medical science is trying to catch up with clinical practice.... The medicines are already being used, but there haven't been studies in place to determine just how safe and effective these agents are. That's what our work is all about."

176.    Despite the initially glowing press releases, Dr. Tariot's actual published results of the 738 Study were not as positive. *See* Tariot, P., *et al., Safety and Tolerability of Divalproex Sodium in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia: Results of a Double-Blind, Placebo-Controlled Trial,* 62 CURRENT THERAPEUTIC RESEARCH, 51 (2001).   The primary endpoint of the study had been to assess the efficacy of Depakote® in the treatment of elderly patients with dementia who exhibited manic symptoms.  However, due to a disproportionate number of study participant dropouts (apparently resulting from excessive patient somnolence and weight loss), the 738 Study had to be terminated prior to full enrollment.

177.    Although the 738 Study thus had failed to reach its primary endpoint and therefore was considered a "negative study" (which could not support a formal FDA application), the study authors were determined to use the study nonetheless to support the intended message that Depakote® could be used to treat agitation associated with dementia. According to the conclusion, "[d]ivalproex sodium demonstrated a statistically significant effect on agitation associated with dementia." *Id.* at 64.

178.    Such enthusiasm in the face of negative study results is not uncommon in drug maker-funded clinical studies.  Research funded by industry is far more likely to report conclusions that favor the sponsor's drug, even if the results did not, in fact, support such conclusions. For example, studies that have examined clinical trials involving specific clinical specialties or particular clinical problems have found an association between industry

62

sponsorship and results that favor the drug industry. *See* CONFLICT OF INTEREST IN MEDICAL RESEARCH, EDUCATION, AND PRACTICE at 105 (2009).

179.    Faced with the fact that the key 738 Study was terminated early due to many study participants' severe somnolence and weight loss, Abbott made a calculated decision to use the 738 Study in its widespread off-label promotion of the Depakote® Products. Abbott provided thousands of reprints of the 738 Study to the LTC Sales Force for dissemination in their off-label promotion.

180.    The LTC Sales Force was trained to emphasize that the 738 Study had demonstrated "the safety, efficacy and ease of use in treating agitation and aggression in dementia patients." In response to the somnolence issues which caused the 738 Study to be terminated, the Sales Force was to tell physicians that the 738 Study used too high an initial dose of Depakote®, and that they should have instead "start low, go slow, titrate to clinical response." The Sales Force was also trained to say that the "really good news" from the 738 Study was that "Depakote was found to significantly reduce the behaviors associated with agitation." The promotion was all off-label and aimed at concealing the truth about the negative results of the 738 Study. In fact, the 738 Study could not support a formal FDA application for the off-label use because of the Study's negative results.

## 2.      Abbott Illegally Promoted the Depakote® Products Using Off-Label Porsteinsson 817 Study

181.    Another example is Dr. Anton Porsteinsson's 2001 Abbott-funded study, Porsteinsson, A., *et al., Placebo-Controlled Study of Divalproex Sodium for Agitation in Dementia,* 9 AMERICAN JOURNAL OF GERIATRIC PSYCHIATRY 58 (2001), which hardly showed Depakote® was better than existing therapies. This is the M98-817 Study (the "817 Study").

FILED UNDER SEAL
133788.00601/36035820v.6

182. The Porsteinsson 817 Study was funded in part by Abbott as an investigator-initiated study ("IIS"). Drug companies like Defendant Abbott use IISs as vehicles to encourage physicians and clinical investigators to study their products and publish or present findings. IISs go by a variety of different names, but are generally structured (when legitimate) such that a pharmaceutical or medical device manufacturer provides a monetary grant to a physician or clinical investigator who, in turn, will design and conduct a clinical study on the manufacturer's product. From the manufacturer's perspective, the manufacturer is not the "sponsor" of the clinical study; instead, the physician or institution acts as the author of the protocol, sponsor, and principal investigator.

183. The FDCA prohibits the introduction of any drug or device into interstate commerce for an intended use that has not been approved as safe and effective by the FDA. 21 U.S.C. § 355(a) & (d). The FDA has consistently sought a broad interpretation of this restriction such that any promotion of a drug or device other than for a use that has been approved as safe and effective by the FDA is in violation of the FDCA. Despite this prohibition, manufacturers are permitted to engage in the "full exchange of scientific information" with physicians and clinical investigators. 21 C.F.R. § 312.7(a).

184. An IIS that is driven by the company's marketing department, as was the case here, triggers potential liability under the Anti-Kickback Act ("AKA"). *See* OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23736 (May 5, 2003). AKA risk is present when study concepts are not generated solely by the physician, but are instead planted by the company to encourage the physician to gain "experience" in using the drug or to learn about the drug. Moreover, if a manufacturer is overly involved with the trial, the involvement could be interpreted as making the manufacturer the true "sponsor" of the trial. If

64

this occurs, the manufacturer could then be required to meet all applicable regulations including IND, IRB, and human subject safety regulations. Further, the trial outcome would not be "independent," and instead would be a manufacturer-sponsored trial that would need to be disclosed in publications, presentations, and other discussions. If the drug maker's sales force is involved in communications with physicians and clinical investigators, this is evidence of improper use of trials to induce physicians to prescribe drugs. Such influence is evidence that the IIS is actually intended to induce referrals and not to encourage clinical investigation. Likewise, any attempts to influence the outcome of a trial suggest the drug company is the true sponsor. For example, providing technical/medical writers or Contract Research Organization (CRO) support directly is evidence of drug maker control over the IIS. Additional evidence of AKA liability is when a drug company marketing department develops IISs as part of a "publication strategy" intended to present off-label use of a product. *See, e.g.*, McNeil, *Tough-Talking Journal Editor Faces Accusations of Leniency,* NEW YORK TIMES, Aug 1, 2006.

185. Rather than the 817 Study being an investigator-initiated study, it is clear that Abbott was in reality the "sponsor." Defendant Abbott's Marketing Department was directly (or indirectly through its retained contract research organization, Covance) involved in enrollment of patients, selection of nursing home sites for study participants, and used its Marketing Department in communicating with physicians and study investigators. As with the Tariot 738 study, in the 817 Study Abbott's Marketing Department actually ran a contest under which nursing homes which enrolled five or more patients would receive a gift of their choice from Abbott. Also, as with the 738 Study, in the 817 Study, Abbott's Medical Liaisons hosted in-services at study sites on the off-label use of the Depakote® Products "to further educate everyone on Depakote and its rule in elderly demented patients, and to devise ways to facilitate

FILED UNDER SEAL

patient recruitment." Moreover, Abbott was in charge of the study protocol, adverse event reporting, all medical issues, monitoring issues, and regulatory issues.

186. Again, Abbott promoted the off-label results of the Porsteinsson 817 Study well in advance of completion of the study in order to use the buzz created to increase the off-label uses of the Depakote® Products. Not until 2001 were the results published in the AMERICAN JOURNAL OF GERIATRIC PSYCHIATRY. There were a number of limitations with the 817 Study: open label design; small sample size (only 56 patients were randomized); short duration of treatment (only six weeks); use of multiple dementia diagnoses and behavioral target symptoms; and manipulation of the divalproex sodium doses by non-blinded physicians. Nonetheless, at best, the 817 Study could only claim that the data "suggest, but do not prove, that this form of therapy can be associated with reduced agitation in some patients with dementia in the nursing home."

187. However, the most significant limitation with the 817 Study is that it used only the Depakote® Sprinkles formulation. At the time, Depakote® Sprinkles was only approved for use to treat epilepsy *in children*, so using on the elderly for the treatment of agitation was completely off-label. Nonetheless, Defendant Abbott provided thousands of reprints of the Porsteinsson 817 Study to its LTC sales representatives to use in their details, especially to counter concerns with the negative Tariot study. Members of the Sales Force were to promote not only the off-label use of the Depakote® Products to treat agitation associated with dementia, but also the off-label use of Depakote® Sprinkles, which was at the time only approved to treat epilepsy in children.

3. **2005 Tariot, *et al.* Study Shows Depakote® Has "No Benefit" in the Treatment of Agitation in Dementia**

FILED UNDER SEAL
133788.00601/36035820v.6

188.    Finally, in 2005 Tariot, *et al.* published a study entitled *Divalproex Sodium in Nursing Home Residents with Possible or Probable Alzheimer Disease Complicated by Agitation,* 13 AMERICAN JOURNAL OF GERIATRIC PSYCHIATRY 11 (Nov. 2005), which found that Depakote® showed "no benefit" for the treatment of agitation in dementia.  In addition, even though Tariot and the study authors had participated in consensus guidelines recommending that Depakote® could be used in the treatment of agitation in dementia (*see supra* at paragraphs 128-131), the 2005 Tariot Study found that none of the earlier studies had proved the Depakote® Products "is efficacious for agitation in dementia, and none was sufficient to define practice." Moreover, the researchers found that "[s]ome recommendations in consensus statements regarding possibly beneficial therapies are not supported by definitive evidence."  The trial had been conducted from September 24, 2000 through December 10, 2002, but was not submitted for publication until 2005.  At no time did Abbott provide reprint copies of this study to sales representatives for dissemination to health care professionals.

### G.    ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS OFF-LABEL THROUGH JOURNAL "SUPPLEMENTS"

189.    Abbott also promoted the off-label use of its drug products through "supplements" to medical journals.  These supplements were typically not peer-reviewed, and offered Abbott another venue to market drug products beyond their approved labeling.  These supplements were frequently prepared in conjunction with a CME set up for Abbott by a Medical Education and Communication Company ("MECC") to present information that appeared to be—but in reality was not—free from drug maker influence.

190.    In 1999, Abbott widely disseminated an article entitled "Phenomenology and Treatment of Aggression Across Psychiatric Illnesses," a supplement to THE JOURNAL OF CLINICAL PSYCHIATRY," by influential doctors Charles B. Nemeroff and Alan F. Schatzberg, and

67

offered it for free along with 4.5 hours of CME credit. Both authors were paid Abbott consultants, funded by an Abbott unrestricted educational grant, and not disclosed in the Supplement. Further, both authors had a history of affiliation with industry-funded CMEs wherein the authors acted as "talking heads" for the drug companies that procured their services rather than provided listeners with substantiated and accurate medical research.

191.    In February 2001, Abbott widely disseminated another supplement entitled "Bipolar Disorder & Impulsive Spectrum Letter," from PSYCHIATRIC TIMES, including an article entitled "Treating Agitation in Dementia With Anticonvulsants." This supplement was prepared by Arline Kaplan, a writer for CME, Inc., Irvine, California with "support by an unrestricted educational grant from Abbott Laboratories." The article discusses a presentation by Alan Siegal, Associate Clinical Professor of Psychiatry at Yale University, at the 13th Annual U.S. Psychiatric & Mental Health Congress, and was offered free along with 1.0 hour of CME credit. The article does not disclose the fact that Dr. Siegal was a paid consultant for Abbott. Again, the article recommends the off-label use of the Depakote® Products.

192.    And, on April 29, 2005, Abbott released a supplement entitled "Case Studies: Management of Epilepsy in Persons with Intellectual/Developmental Disabilities With or Without Behavioral Problems." It was sponsored by the Postgraduate Institute for Medicine and Jobson Education with an educational grant from Abbott Laboratories. The supplement was authored by two paid Abbott researchers, Dr. Eric Hollander and Dr. Theodore R. Sunder.

193.    In addition to using reprints of studies funded by Abbott in its promotion, the LTC Sales Force published summaries of studies as supplements to journals. For example, in 2001, Abbott supplied the LTC Sales Force with thousands of copies of a "Meeting Reporter," summarizing two papers on the off-label use of the Depakote® Products. The Meeting Reporter

FILED UNDER SEAL
133788.00601/36035820v.6

was prepared by Advanstar Communications, Inc., a MECC, and was "sponsored by a grant from Abbott." Abbott's LTC Sales Force handed out thousands of the Meeting Reporter to healthcare professionals as part of their off-label detail.

194.     Another supplement used by Defendant Abbott was introduced in March 2004 entitled "New Strategies for Managing Dementia and Improving Medication Pass Outcomes." It was purportedly prepared by Advanstar as a supplement to the periodical Geriatrics and was sponsored as a CME. The faculty included Tom Snader, a regular Abbott speaker and explicitly promoted off-label use by indicating that the Depakote® Products were recommended for treatment of agitation and aggression and presented a case study where the patient, who had been suffering from agitation related to dementia, was prescribed Depakote ER®.

## H.     ABBOTT'S DEVELOPMENT OF "KEY OPINION LEADERS" THROUGH GIFTS, ADVISORY BOARDS, CONSULTANT MEETINGS, AND SPEAKER TRAINING

195.     Abbott's LTC Group and later its SAE Institutional Group developed a core marketing strategy of identifying "Key Opinion Leaders" ("KOLs") – *i.e.*, physicians who would influence their peers' medical practice, including but not limited to prescribing behavior. Abbott engaged numerous LTC KOLs beginning at least as early as shortly after the launch of the LTC Sales Force in 1998 to provide advocacy, as well as key marketing feedback and activities, including speaker programs and CME programs throughout the United States.

196.     Abbott's marketing strategy grouped KOLs into three levels, depending on their status and role in marketing the Depakote® Products in LTC facilities:

- **Level I KOLs.** These physicians and pharmacists (regarded as the highest level national researchers and thought leaders) regularly were invited to advisory board meetings to discuss clinical, strategic, and tactical issues related to the Depakote® Products. The Level I KOLs were generally under long-term consulting agreements

69

with Abbott. Among those on the National advisory board were: Dr. Peter Mark Aupperle (Piscataway, New Jersey), Dr. J. Randy Mervis (North Ridge, California), Dr. Anton Porsteinsson (Rochester, New York), Dr. Lon Schneider (Los Angeles, California), Dr. Gary Small (Los Angeles, California), Tom Snader, Pharm.D. (Sellersville, Pennsylvania), Dr. Pierre Tariot (Rochester, New York), Dr. Larry Tune (Atlanta, Georgia), and Dr. Andrew Weinberg (Dunwoody, Georgia). All of these Level I KOLs were regular speakers in Abbott's national speaker programs (described below) and CMEs (described below), in which they discussed the off-label use of the Depakote® Products.

- **Level II KOLs.** These are KOLs who were considered regional opinion leaders that Abbott regularly invited to regional meetings, and were called on for shorter term, tactical feedback about the off-label use of the Depakote® Products.

- **Level III KOLs.** These are local level KOLs that Abbott would ask to do speaker programs. These Level III KOLs were given speaker training, including "orientation to data relevant to Depakote and the markets it competes in, and speaking points" concerning the off-label use of the Depakote® Products. Local level KOLs were ranked according to their decile ranking, decile 1 through decile 10 (with decile 10 being the highest prescribers of Depakote® and related products), and for whom Abbott's LTC Sales Force had the greatest sales opportunities. As with many other physicians Defendant Abbott wished to influence (including Levels I and II KOLs) to prescribe the Depakote® Products, the goal was to build relationships with the Level III KOLs through gifts (*e.g.*, sports tickets, dinners, golf outings) and speaker

70

honoraria to encourage these high decile KOLs to prescribe more of the Depakote®
Products.

197.    The Level I National KOLs also included doctors who had key roles in national
advocacy organizations and at advocacy organization meetings.  For example, Dr. Tariot was a
medical advisory board member of the Alzheimer's Foundation of America, an organization
Abbott called upon regularly to support its off-label promotional campaign.  The Level I KOLs
had their own intranet website (www.nsa.com) on which they communicated with Abbott
directly.  In addition, Abbott communicated with all of its Level I and II KOLs through a "KOL
Newsletter."

198.    Among the gifts provided to KOLs were tickets to sporting events.  For example,
on April 2, 2001, Abbott paid $2,000 for opening day tickets for the San Diego Padres game
against the San Francisco Giants at Qualcomm Stadium in San Diego.  The tickets were provided
to KOLs who attended an off-label presentation concerning the use of the Depakote® Products.

## I.    ABBOTT'S OFF-LABEL PROMOTION OF THE DEPAKOTE® PRODUCTS THROUGH SPEAKER PRESENTATIONS

199.    Promotional programs funded and conducted by pharmaceutical companies are
highly regulated by the FDA.  Essentially, promotional educational presentations must be "on-
label," presenting only information about FDA-approved uses contained in the product's package
insert.  Promotional talks must also contain "fair balance"—*i.e.,* a discussion of the risks and
benefits of the drug, including adverse effects, precautions, and warnings.  Above all,
promotional programs must be truthful and not misleading.  All presentation slides, whether
provided by the pharmaceutical company or developed by the speaker, should be designed to
meet these requirements.

71

FILED UNDER SEAL

200.    A narrow exception to the "on-label" rule exists for promotional programs. Speakers may answer questions about unapproved drug uses so long as the questions posed by the audience are unsolicited. Speakers should clearly advise the audience that the answer is outside the scope of approved labeling and that they are speaking from independent medical judgment. Questions should be answered briefly, to avoid unnecessary off-label discussion, and then the discussion should be guided back to the originally planned, on-label presentation.

201.    Beginning in at least as early as 1998, the LTC Sales Force set up hundreds of speaker programs for healthcare professionals at which off-label promotional presentations were offered that flouted the FDA rules regarding such presentations. The programs were rife with illegal promotional activities. The presentations used were, in many cases, the identical off-label sales materials that Abbott's speakers used in their promotional CME presentations, described below. The Sales Force chose the speakers and the topics, and handled the negotiations with the speakers who gave the presentations. In many instances, the speakers were chosen because they were also high decile prescribers of drugs to treat agitation and aggression associated with dementia. As such, the speaker monies were an improper effort to develop KOL product allegiance and improve the relationships between the speakers and Abbott.

202.    Here are samples of the dinner presentations that Abbott's LTC Sales Force used to promote the Depakote® Products off-label:

### 1.    **Alejandro Alva, M.D.**

203.    On October 30, 2003, Dr. Alejandro Alva, Medical Director for Chapman Medical Center Gero-Psychiatric Program, Orange, California, gave a dinner presentation for Abbott on "The Treatment of Agitation & Aggression Associated with Dementia," at the Hobbit

72

FILED UNDER SEAL

Restaurant in Orange, California, a four star restaurant. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

### 2. William Jay Apfeldorf, M.D., Ph.D.

204. On April 20, 2006, Dr. William Jay Apfeldorf, a psychiatrist from Albuquerque, New Mexico, gave a presentation for Abbott on "The Treatment of Agitation and Aggression in Dementia," at the Embassy Suites Hotel in San Diego, California. The sponsor was ABcomm, Inc.—a continuing medical education firm located in Champaign, Illinois formed by a former Abbott employee, Robert Kenney—and the honorarium was $1,000. There were forty physicians in attendance. The presentation discussed the off-label use of Depakote®.

### 3. Dan Anderson, M.D.

205. On September 26, 2000, Dr. Dan Anderson, gave a presentation for Abbott on "Managing Behavior Disorders in Dementia Residents & CMS Update Guidelines" at the Hawaii Prince Hotel in Honolulu, Hawaii. The sponsor was ABcomm and the honorarium was $1,000. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

206. On December 17, 2001, Dr. Dan Anderson, gave another presentation for Abbott on "New Developments in Treating Patients with Agitation and Aggression in Dementia," at the San Diego Qualcomm Stadium. The sponsor was ABcomm. The presentation was for health care professionals who worked for nursing homes serviced by Belville Pharmacy Services, Inc., a large Southern California institutional pharmacy. The presentation also included baseball tickets to watch a San Diego Padres baseball game. At the time, Defendant Abbott was negotiating a rebate agreement with Belville. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

73

207.    On December 17, 2001, Dr. Dan Anderson, gave another presentation for Abbott

on "The Classic and New Mood Stabilizers: Their Role in Treating Elderly Dementia Patients

with Behavioral Disturbances," at the Pinot Provence, a four-star restaurant in Costa Mesa,

California. The sponsor was ABcomm. The presentation discussed the off-label use of

Depakote® to treat agitation and aggression in the treatment of dementia.

### 4.    Alan Berkowitz, M.D.

208.    On April 30, 2002, Dr. Alan Berkowitz, Medical Director of the Pomerado

Hospital Medical Psychiatric Unit (and medical director of several LTC facilities), gave a

presentation for Abbott on "The Role of Mood Stabilizers in Treating Behavioral Disturbances

Associated with Dementia" at Salvatore's Cucina Italiana, a four-star restaurant in San Diego,

California. The sponsor was ABcomm, Inc. and the honorarium was $1000. There were sixteen

health care professionals in attendance. The presentation discussed the off-label use of

Depakote® to treat agitation and aggression in the treatment of dementia.

### 5.    Dr. Doe, M.D.

209.    On February 21, 2002, Dr. Doe, a psychiatrist from Long Beach, California, gave

a round table slide presentation funded by an Abbott unrestricted educational grant to a group of

health care professionals from Geriatrix, Inc. (a nursing home chain). The audience included

LTC nurse practitioners, who spend 100 percent of their time caring for LTC patients. The

presentation discussed the off-label use of Depakote® to treat agitation and aggression in the

treatment of dementia.

210.    On August 29, 2002, Dr. Doe gave a presentation funded by an Abbott

unrestricted educational grant on "The Treatment of Aggressive Behavior and Other Mood

Disorders in Long-Term Care Residents," at Pinot Provence, a four-star restaurant in Costa

FILED UNDER SEAL

Mesa, California. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

211. On August 27, 2003, Dr. Doe gave a presentation funded by an Abbott unrestricted educational grant on "Using Mood Stabilizers to Treat Agitated & Aggressive Behaviors Associated with Dementia," at Pinot Provence, a four-star restaurant in Costa Mesa, California. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

212. On February 3, 2005, Dr. Doe gave a presentation funded by an Abbott unrestricted educational grant on "Treating Agitation and Aggression in Dementia," at Morton's Steak House in San Diego California. The sponsor was ABcomm, and the honorarium was $1,000. There were thirty physicians in attendance. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

### 6. Lawrence Jaffe, M.D.

213. On May 6, 2004, Dr. Lawrence Jaffe, a psychiatrist from San Diego, California, gave a presentation funded by an Abbott unrestricted educational grant on "The Role of Mood Stabilizers in Long Term Care," at Roy's Restaurant, a four-star restaurant in San Diego, California. Dr. Jaffe's honorarium was $500.

214. October 26, 2005, Dr. Jaffe led a physician round table funded by an Abbott unrestricted educational grant on "Treating Behavior Disorders Associated with Dementia," at Roy's Restaurant in San Diego, California. The sponsor was ABcomm, Inc. and the honorarium was $750. About 15 physicians attended. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

FILED UNDER SEAL
1337880060]/06035820v6

215.     On August 29, 2006, Dr. Jaffe led a physician round table funded by an Abbott unrestricted educational grant on "Treating Behavior Disorders Associated with Dementia," at Osetra the Fishhouse in San Diego, California. The sponsor was ABcomm, Inc. and the honorarium was $750. About 15 physicians attended. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

### 7.     Michael Y. Komeya, M.D.

216.     On July 3, 2002, Dr. Michael Y. Komeya, a geriatric psychiatrist in Honolulu, Hawaii gave a presentation funded by an Abbott unrestricted educational grant on "The Treatment of Agitation and Aggression in Dementia" at a restaurant in Honolulu. The honorarium was $1,000. His presentation discussed the off-label use of Depakote® for the treatment of agitation and aggression in the treatment of dementia.

### 8.     Sarabjit S. Sandhu, M.D.

217.     On May 24, 2000, Sarabjit S. Sandhu, M.D., the Neurology Medical Director at Newport Bay Hospital, gave a dinner speech entitled "The Treatment of Agitation and Aggression in Dementia: The Role of Mood Stabilizers in Behavioral Disturbances Associated with Dementia" at the Pino Provence, a four star restaurant in Cost Mesa, California. There were forty-four healthcare care professionals in attendance. The sponsor for the event was ABcomm, hired by Abbott to run the program through an "unrestricted educational grant." The honorarium was $750. The presentation discussed the off-label use of Depakote® to treat agitation and aggression associated with dementia.

### 9.     Daniel Sewell, M.D.

218.     On July 30, 2002, Dr. Sewell gave a presentation funded by an Abbott unrestricted educational grant on "The Role of Mood Stabilizers in Treating Behavior

76

Disturbances Associated with Dementia," at Laurel's Restaurant in San Diego California. The sponsor was ABcomm. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

219.    On July 23, 2003, Dr. Sewell gave a presentation funded by an Abbott unrestricted educational grant on "The Role of Mood Stabilizer in Long Term Care," for Kaiser Permanente physicians and nurse practitioners. The honorarium was $500. His presentation discussed the off-label use of Depakote® for the treatment of agitation and aggression in the treatment of dementia.

220.    On January 20, 2004, Dr. Sewell gave a presentation funded by an Abbott unrestricted educational grant on "The Treatment of Manic Symptoms in the Elderly," for thirty physicians at Morton's Steakhouse. The sponsor was ABcomm, and the honorarium was $750. His presentation discussed the off-label use of Depakote® for the treatment of agitation and aggression in the treatment of dementia.

### 10.    William Wirshing, M.D.

221.    On December 16, 2002, Dr. William Wirshing, a psychiatrist at the West Los Angeles Veterans Administration Medical Center, gave a presentation funded by an Abbott unrestricted educational grant on "Treating Spectrum Mood Disorders," at the Four Season's Hotel in Newport Beach, California. The honorarium was $1,500. His presentation discussed the off-label use of Depakote® for the treatment of agitation and aggression in the treatment of dementia.

### J.    ABBOTT'S CONTROL OF CMEs TRANSFORMED THEM INTO PROMOTIONAL EVENTS FOR THE OFF-LABEL USE OF THE DEPAKOTE® PRODUCTS

222.    Another key source of drug information for doctors is CME courses, usually medical lectures held locally featuring KOLs. Required to maintain medical licenses and to stay

77

current with new developments to give patients the best medical care, many CME courses provide expert syntheses of clinical trial information.

223.     The percentage of CMEs that are commercially funded increased significantly from forty-eight percent in 1998 to fifty-eight percent in 2002.  Currently, sixty percent of CMEs have direct commercial sponsorship; indirect sponsorship (*e.g.,* via non-profits funded by company money) accounts for a large portion of the remainder.  Total industry contributions towards continuing medical education is estimated to be seventy percent or higher and total in the hundreds of millions of dollars.

224.     Survey data from the Accreditation Council for Continuing Medical Education ("ACCME") show that industry funding of accredited continuing medical education increased by more than 300 percent between 1998 and 2007 (ACCME, 2008). Moreover, profit margins increased substantially, from 5.5 percent in 1998 to 31 percent in 2006 (Steinbrook, 2008b).

225.     The content of the CME programs is intended to be independent of drug companies. According to ACCME standards (*see* Accreditation Council for Continuing Medical Education Standards for Commercial Support, Adopted April 2004, approved Sept 2004. Available at http://www.accme.org/dir_docs/doc_upload/68b2902a-fb73-44d1-8725-80a1504e520c_uploaddocument.pdf ) and FDA guidance (*see* U.S. Food and Drug Administration Center for Drug Evaluation and Research Guidance for Industry: Industry-Supported Scientific and Educational Activities. U.S. Department of Health and Human Services Food and Drug Administration Office of Policy, Nov 1997.  Available at http://www.fda.gov/cder/guidance/isse.htm), independent educational grants cannot be tied to the purchase, sale, prescription, or recommendation of the company's products.  There cannot be price concessions to help offset a customer's purchase or reimbursement of drugs, and there

78

cannot be any payment to ensure that the grant recipient markets the company's drugs during the educational program. Grants provided to customers of a pharmaceutical company (institutional pharmacies, retail chain pharmacies, pharmacy benefit managers, managed care organizations, and others) must be especially focused on educating health care professionals in order to avoid any appearance of price concession or *quid pro quo* arrangement. Responsibility for and control over the selection of content, faculty, educational methods, materials, and venue belong <u>solely</u> to the CME provider in accordance with their guidelines.

226. According to Abbott's own Operating Guidelines for Program Funding issued in 1998 (updated on April 23, 2001 and again on September 16, 2004 – collectively, the "Funding Guidelines"), Abbott would only provide education funding for programs "which seek to foster increased understanding of scientific, clinical or health care issues that contribute to the enhancement of patient care through the making of educational grants." All such grants were to be provided to independent organizations only, including CME providers and "must be independent of Abbott commercial influence." *See* PPD Operating Guidelines for Program Funding (2001). In addition, the CME provider was to assure that Abbott "will not bias the program" in favor of its drug products. And, the CME provider was to disclose all Abbott "funding and significant relationship between themselves, presenters, moderators, and Abbott." According to Abbott's Funding Guidelines, if off-label use of an Abbott product was discussed in the program, the CME provider "must specifically state that such uses are unapproved." Any "program that focuses on a specific product when other treatments are available may be denied" funding. Nor were Abbott personnel supposed to control program content according to the Funding Guidelines. Finally, under Abbott's rules for speakers, "no grants may be offered or given with the intent to induce or in exchange for an explicit or implicit agreement or

79

understanding that Abbott products will be used, purchased, leased, ordered, prescribed, recommended, or arranged for or provided formulary or other preferential or qualifying status." *See* 2004 Program Funding, Operating Product – Medical Education.

227. Abbott regularly violated the FDA guidance and its own Funding Guidelines governing CME events in that, although the programs offered through ABcomm could ostensibly present off-label information, Abbott manipulated the CME programs into events promoting off-label uses of the Depakote® Products. Therefore, even though the events highlighting the off-label use of the Depakote® Products were run through ABcomm, in fact, they were simply a well-disguised Abbott marketing message basically mimicking Abbott's illegal promotional speaker programs that encouraged off-label use of the Depakote® Products.

228. Beginning at least as early as 1998, Abbott contracted with ABcomm, Inc. ("ABcomm") to set up CME programs using recognized clinical experts, well-known and respected in their field and referred to as "thought leaders" or "key opinion leaders," to conduct CMEs and product promotional programs.

229. ABcomm was the exclusive MECC handling all speaker events for Defendant Abbott at all times material hereto. Until at least the second quarter of 2005, Abbott had complete control over the choice of speakers for all ABcomm meetings, the topics and slides speakers were to use, and the audience who would be invited to hear the presentations. In addition, Abbott selected the venues and sent invitations to all attendees. Abbott sales representatives negotiated speaker honoraria, and managed the sign-in sheet of attendees.

230. The purpose of using ABcomm was to provide the appearance of an "arms length" transaction between Abbott and the educational program it was funding. ABcomm was to be the "independent" third party so that any discussion of off-label indications during the

80

CME would appear to be unrelated to Defendant Abbott. When Relator Spetter submitted paperwork in 2002 for an off-label presentation by Dr. Dan Anderson, his manager Roger Aumann wrote him a memo admonishing him:

> Never, ever, can the person who is receiving the money be the same one who is signing the [Letter of Agreement]. Period. Never. The purpose of the [Letter of Agreement] is to provide an 'arms length' between Abbott and the educational program itself. There needs to be an 'independent' third party to make that distance; all educational programs (*i.e.*, that are discussing any out of label indications) require this.

231.    In the second quarter of 2005, Abbott announced that sales representatives could only "suggest" speakers for ABcomm speaker events, and could no longer manage the sign-in sheet or transport speakers to the CME event. Even then, however, Abbott continued to control the speaker's subject, the speaker's materials, and who would be invited to hear the off-label presentation.

232.    At all times material hereto, ABcomm understood that its direct funding from Abbott in the form of educational grants was implicitly, if not explicitly, conditioned on the presentation of topics that interested Abbott and included speakers that spoke favorably of the Depakote® Products.

233.    Moreover, paying lucrative speaker fees was a key part of Abbott's marketing of the Depakote® Products to psychiatrists who, as a group, earn less in base salary than any other medical specialists. Benedict Carey and Gardiner Harris, *Psychiatric Group Faces Scrutiny Over Drug Industry Ties,* NEW YORK TIMES, July 12, 2008. In 2007, for example, median compensation for psychiatrists was $198,653, less than half of the $464,420 earned by diagnostic radiologists and barely more than the $190,547 earned by doctors practicing internal medicine. But, many psychiatrists supplement this income with consulting arrangements with drug makers, traveling the country to give dinner talks about drugs to other doctors for fees generally ranging

81

from $750 to $3,500 per event. While data on industry consulting arrangements is sparse, state officials in Vermont reported that in the 2007 fiscal year drug makers gave more money to psychiatrists than to doctors in any other specialty. *Id.*

234.    The speakers Abbott hired also were, in most instances, "high writers" of drugs for the treatment of dementia. Thus, the speakers were not only physicians who could influence their peers' medical practices, including but not limited to prescribing behavior, but they were KOLs whom Abbott wanted to influence to use more of the Depakote® Products for dementia-treatment.

235.    For example, Dr. "John Doe," (hereinafter "Dr. Doe") was a high decile provider in Southern California, and known at the time as one of the largest prescribers of atypical antipsychotic drugs in the country. At the direction of his manager, Roger Aumann, Relator Spetter worked to build a KOL relationship with Dr. Doe, and was able to get Dr. Doe to dramatically increase his Depakote® prescriptions in both the retail and the LTC markets. As part of influencing Dr. Doe's prescribing of the Depakote® Products, Dr. Doe was hired to become a KOL speaker for Abbott, where he regularly discussed the off-label uses, described herein.

236.    Another speaker was Dr. Lawrence Jaffe, the largest prescriber of psychiatric medicines in LTC facilities in San Diego County, California. At the direction of his manager, Roger Aumann, Relator Spetter developed Dr. Jaffe into a KOL/speaker to ensure that he used the Depakote® Products as initial treatment for agitation and aggression. As part of influencing Dr. Jaffe to prescribe more of the Depakote® Products, Abbott scheduled him to speak at a number of events (as described herein). Dr. Jaffe later reported to Relator Spetter that he had made the Depakote® Products his "agent of choice for agitation and aggression."

FILED UNDER SEAL
133788.00601/6625920v.16

237.    Another way to develop speakers and to increase market share for the Depakote®

Products was to focus attention on physician groups.  One such physician group was GeriNet, a

physician group that contracts with health plans, PPOs, and other medical groups on capitated

and fee-for-service bases to provide specialty physician services. GeriNet services more than 360

skilled nursing facilities in San Diego, Orange, and Los Angeles counties in Southern California

as well as in Las Vegas, Nevada.  GeriNet is the largest LTC geriatrician medical group in its

region of the country.  GeriNet's customers consist of approximately 60 percent HMO patients

and 40 percent MediCal/Medicare patients.  At the direction of his manager, Roger Aumann,

Relator Spetter developed a relationship with Dr. Christine Mlot, the Chief Medical Officer of

GeriNet, in part by making her a speaker on behalf of the Depakote® Products.  Dr. Mlot

became a large prescriber of Depakote®.

238.    Another influential doctor group was Psychiatric Centers of San Diego, which had

offices throughout San Diego County and had geriatric psychiatrists that see significant numbers

of LTC patients as part of their practices.  At the direction of his manager, Roger Aumann,

Relator Spetter developed Dr. Berkowitz (a significant prescriber of drugs to treat dementia) as a

KOL speaker and clinical consultant on the off-label use of the Depakote® Products.

239.    And, beginning at least as early as 2000 up through at least 2006, Abbott engaged

CENE ("Council for Excellence in Neuroscience Education"), a division of Access-Medical, to

provide interactive CD-ROMs, monographs, and on-line webcast CME programs for

psychiatrists, neurologists, and long-term care specialists on various off-label topics concerning

the use of the Depakote® Products.  Sales representatives, including Relator Spetter, were asked

to provide health care professionals materials to invite them to use CENE materials and/or to

FILED UNDER SEAL

attend CENE webcasts. Most (if not all) of the CENE materials were (and still are) available on the www.cene.com website, including the following:

- "The Expanding Role of Mood Stabilizers," by J. Craig Nelson, M.D., Professor of Psychiatry at Yale University School of Medicine, first available on January 10, 2001. The slides (sponsored by Abbott) are from a presentation at the American Association for Geriatric Psychiatry 2001 annual meeting, and discuss the off-label use of Depakote® to treat mania and agitation associated with dementia;

- "Current Trends in the Management of Psychosis," first available on June 8, 2001. The slides include information on the "trends" in the off-label use of Depakote® to treat schizophrenia and schizoaffective disorder;

- "Clinical Trial Results of Divalproex Sodium (Depakote® Delayed-Release) in the Treatment of Psychosis with Schizophrenia," first available on October 4, 2001. The slides include information on the Casey Study, discussed *infra* at paragraphs 298-307, the off-label use of Depakate® to treat schizophrenia; and

- "Differentiating Depression, Delirium and Dementia," by Megg Wheeldon RN, BSN, A/GNP-C, Geriatric Educator and Advanced Practice Nurse, President, Wheeldon Health Associates, Littleton, Colorado. The slides were first available on August 28, 2002, and discuss the off-label use of Depakote® in the treatment of agitation associated with dementia.

Sales representatives were provided business reply cards and webcast announcement postcards they were to distribute to health care professionals, inviting them to obtain CENE materials and/or to participate in CENE events. The entire package of CENE events was called "One Brain—Many Disorders," and included up to 43 hours of CME credit for clinical in psychiatry,

neurology, and long-term care. The CMEs were all supported by an educational grant from Abbott.

240. And, Abbott funded CME monographs, which promoted off-label uses of the Depakote® Products. Not only were these monographs available on the www.cene.com website, sales representatives were provided business reply cards they disseminated to health care professionals throughout the United States, giving them instructions how they could request hardcopy versions of the monographs. One such monograph was entitled "The Bipolar Spectrum: Rational Polypharmacy," sponsored by Access-Medical Group, Arlington Heights, Illinois and funded through an unrestricted educational grant from Abbott. The editors of the monograph were Dr. Charles L. Bowden, M.D. and Dr. James A. Wilcox, D.O., Ph.D., both Abbott consultants. The monograph was published on February 25, 2002, and included two hours of CME credit. Among the topics included in the monograph were the off-label use of Depakote® as the preferred agent to treat euphoric mania, mixed or dysphoric mania, mania with psychosis, severe bipolar depression, bipolar depression with recent rapid cycling, bipolar with substance abuse, PTSD, panic disorder, and/or borderline personality disorder.

241. Each of Defendant Abbott's LTC sales representatives was given an annual "War Chest" to "invest" in developing KOL speakers for CME programs aimed at the off-label promotion of the Depakote® Products. Abbott LTC sales representatives were present at all the events to ensure that the sales message intended for the CME was presented, and frequently provided sample topics to the CME speakers which favored the company's off-label marketing message for the Depakote® Products.

242. Here are examples of the off-label CME events Abbott used to promote the Depakote® Products:

85

### 1. Dan Anderson, M.D.

243.    On June 1, 2000, Dr. Dan Anderson, (a geriatric psychiatrist from Folsom, California who was Medical Director at Del Amo Hospital in Torrance, California; Topaz Health PsychCare Alliance in Redondo Beach, California; La Paz Geropsychiatric Center in Paramount, California; and Los Altos Mental Hospital in Long Beach, California) gave a presentation for Abbott on "The Role of Mood Stabilizers in Behavioral Disturbances Associated with Dementia" in the Galeria Room at the La Valencia Hotel in La Jolla, California. The sponsor was ABcomm, Inc., the honorarium was $1000, and there were nine healthcare care professionals in attendance. Even though the presentation was accredited as a CME course(so product promotion was not allowed), the presentation was orchestrated by Abbott as an off-label promotion of Depakote® to treat agitation and aggression in the treatment of dementia.

244.    On November 15, 2000, Dr. Anderson gave a presentation for Abbott on "New Developments in Mood Stabilizers and their Role in Treating Behavioral Disturbances Associated with Dementia" at Morton's Steakhouse in Santa Anna, California. The sponsor was ABcomm, Inc. and the honorarium was $1000. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia. This is another example of a presentation with CME credit offered, so product promotion was not allowed. However, the presentation was orchestrated by Abbott as an off-label promotion of Depakote® to treat behavioral disturbances in the treatment of dementia.

### 2. Peter Aupperle, M.D.

245.    On August 21, 2003, Dr. Peter Aupperle (Director, Division of Geriatric Psychiatry at Robert Wood Johnson Medical Group), Dr. Lesley Blake (Director, Geriatric Psychiatry at Northwestern University Medical School), and Dr. Steven T. DeKosky (Professor

86

and Chair of the Department of Neurology at the University of Pittsburg) gave a presentation for Abbott on "Neuroprotection: Basic Science Data and the Clinical Implications" at the Sheraton Chicago Hotel. All three speakers disclosed they served as consultants for Abbott. While the presentation was accredited as a CME (so there could be no product promotion), Abbott controlled the choice of speakers, the topics, and who was invited. Dr. Blake offered a presentation on "The Potential Role of Mood Stabilizers in Neurodegenerative Disease," a discussion of the off-label use of Depakote® for the treatment of agitation and aggression associated with dementia. In addition, Dr. Aupperle's presentation stated that Depakote® was "effective as monotherapy for agitation, aggression" in treating dementia. The sponsor was ABcomm. Although no materials associated with this presentation explicitly disclose that Abbott funded the presentations, Abbott did, in fact, fund the CMEs through an educational grant.

### 3. Dr. Alan Berkowitz, M.D.

246.    On December 9, 2004, Dr. Alan Berkowitz gave a presentation for Abbott on "Treatment of the Cognitively Impaired in the LTC Setting" at Pomerado Hospital in Poway, California. The sponsor was Pomerado Hospital and the honorarium was $400. There were sixteen health care professionals in attendance. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

### 4. Dr. Philip Botkiss, M.D.

247.    On January 13, 2005, Dr. Philip Botkiss (a psychiatrist from San Diego, California) gave a presentation funded by an Abbott unrestricted educational grant on "Treatment of Mood & Behavior in Dementia" at Baron Valley Resort & Casino (a four star resort and casino in San Diego, California). The sponsor was the Council for Long Term Care

FILED UNDER SEAL

Nurses of California, San Diego Chapter and the honorarium was $750. There were sixteen health care professionals in attendance. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia. CME credit was offered. The presentation was promotional.

### 5. Dr. Doe, M.D.

248. On October 1, 2003, Dr. Doe (a psychiatrist from Long Beach, California) gave a presentation funded by an Abbott unrestricted educational grant on "The Role of Mood Stabilizers Across Psychiatric Disorders in Long Term Care" at Donovan's Restaurant in San Diego, California. The honorarium was $1000. Because CME credit was offered, the presentation could not be promotional. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

249. On June 22, 2004, Dr. Doe gave a presentation funded by an Abbott unrestricted educational grant on "The Treatment of Agitation & Aggression in Dementia Patients," at The Lodge Restaurant in Costa Mesa, California. ABcomm was the sponsor. Because CME credit was offered, the presentation could not be promotional. Dr. Doe did not disclose any financial relationships with Abbott, although he had been a KOL and speaker at prior programs funded by an Abbott unrestricted educational grant. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

### 6. Lawrence Jaffe, M.D.

250. On November 8, 2005, Dr. Jaffe led a physician "round table meeting of the minds" funded by an Abbott unrestricted educational grant on "Treating Approaches for Behavior Disorder in the Dementia Patient" at Sofia's Italian Table in San Diego, California. The sponsor was ABcomm, Inc. and the honorarium was $750. The presentation offered CME

FILED UNDER SEAL

credit. The presentation discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia. Even though Dr. Jaffe had received speaker honoraria from Defendant Abbott on at least two prior occasions in the prior year, and was considered a Abbott KOL, neither he nor ABcomm disclosed this potential conflict of interest on his ACCME Conflict of Interest disclosure form.

### 7. Daniel Sewell, M.D.

251. On August 29, 2002, Dr. Daniel Sewell gave a presentation funded by an Abbott unrestricted educational grant on "The Role of Mood Stabilizers in Treating Behavior Disorder Patients" at the Laurel Restaurant in La Jolla, California. The presentation was sponsored by ABcomm, and CME credit was offered, so the presentation could not be promotional. Abbott sales representatives (including Relator Spetter) were present. Dr. Sewell's presentation discussed the off-label use of Depakote® for agitation and aggressiveness associated with dementia.

252. On March 30, 2004, Dr. Sewell gave a presentation funded by an Abbott unrestricted educational grant on "The Treatment of Agitation and Aggression in Dementia and Other Psychiatric Disorder in Long-Term Care" at Donovan's Steakhouse (a four star restaurant). The sponsor was ABcomm. His presentation slides discussed the fact that "[n]o medication is approved by the FDA for the treatment of behavioral disturbance in patients with dementia," the off-label use of divalproex for the treatment of agitation and aggression in the treatment of dementia, and the "expected benefits" of Depakote ER®. In addition, Dr. Sewell discouraged the use of anti-psychotics due to OBRA-87. Because the presentation provided CME credit, no part of it could be promotional. Nonetheless, the presentation promoted the off-label use of Depakote®.

FILED UNDER SEAL

### 8. Jeanne Jackson-Siegal, M.D.

253. ABcomm sponsored (through an educational grant from Abbott) an on-line CME seminar expiring November 11, 2009 entitled "An Evidence-Based Approach to Treating Behavior Disturbances & Seizure Patients." The CME seminar was given by Dr. Jeanne Jackson-Siegal, M.D. (Assistant Chair of Psychiatry at Yale University); Joseph Sirven, M.D. (Associate Professor of Neurology at the Mayo Clinic College of Medicine); Alan P. Siegal, M.D. (Assistant Professor of Psychiatry at Yale University); and Thomas Snader, Pharm.D. (President of TCS Pharmacy Consultants). Drs. Jackson-Siegal and Snader disclosed financial relationships with Abbott. One of the explicit goals of the program was to "compare and contrast antiepileptic drugs based on safety and efficacy profiles, as well as drug interactions, in older patients who often have complicated drug regimens." The target audience for the program was physicians, pharmacists, and nurse practitioners. *See* http://www.rxschool.com/course/info.cfm/course_id/232 (last checked on January 15, 2010). Dr. Jackson-Siegal and Dr. Snader are both Level I KOLs.

### 9. Gary Small, M.D.

254. On August 16-17, 2000, Dr. Gary W. Small (Professor of Psychiatry and Director of the Center for Aging at UCLA) headed a dementia mini-fellowship funded by an Abbott unrestricted educational grant at the Beverly Hilton Hotel in Los Angeles, California entitled "Update on Managing Behavioral Syndromes." Additional speakers included Dr. Howard Feldman, M.D., of the University of British Columbia, and Larry Tune, M.D., of Emory University School of Medicine. Dr. Tune was a paid Abbott consultant. The sponsor was ABcomm. There were forty-four participants, all of whom received an honorarium for attending. Because the mini-fellowship was a CME, no part of the seminar could be promotional. The

90

FILED UNDER SEAL

presentations included discussions of the off-label use of Depakote® for the treatment of agitation and aggression associated with dementia. Abbott sales representatives (including Relator Spetter) attended the mini-fellowship.

### 10.    Pierre N. Tariot, M.D.

255.    On September 22-23, 2000, Dr. Pierre N. Tariot, a national Level I Abbott KOL, and a geriatric psychiatrist and internist known for his research of drug therapies for Alzheimer's disease and other forms of dementia (including research related to Depakote®), led a dementia mini-fellowship funded by an Abbott unrestricted educational grant on "Update on Managing the Agitated Patient" at the Four Points Sheraton Rochester Riverside Hotel in Rochester, New York. The participants all received an honorarium for attending. The presentations included discussions of the off-label use of Depakote® for the treatment of agitation and aggression associated with dementia. Abbott's sales representatives attended the mini-fellowship.

### 11.    Larry E. Tune, M.D.

256.    In June 2001, Dr. Larry E. Tune (Professor of Psychiatry and Behavior Sciences at Emory University in Atlanta, Georgia) presented a case study video and reference guide entitled "The Role of Mood Stabilizers in Treating Aggression." Dr. Tune's co-presenters were Lori Daiello, Pharm.D. (Geriatric Psychopharmacology Specialist); Kay Lloyd, RNC, BSN (Director of Education at the Fountainview Center for Alzheimer's Disease); and Andrew Weinberg, M.D. (Associate Professor of Medicine Emory University School of Medicine). Dr. Tune, Dr. Daiello, and Dr. Weinberg were all Abbott-paid consultants. The symposium provided 1.3 CME credits for the attendees, and thus could not be promotional. Abbott supported the video case study through an unrestricted educational grant. ABcomm was the sponsor. The presentations discussed the off-label use of Depakote® for the treatment of agitation and

91

Case 1:10-cv-00006-JPJ-PMS   Document 36-1   Filed 12/03/10   Page 31 of 75   Pageid#: 544

aggression associated with dementia. Sales representatives distributed brochures, announcing the video as part of their promotion of the Depakote® Products.

257.     On March 6, 2005, Dr. Tune headed a lunch symposium at the American Association of Geriatric Psychiatry conference entitled "Improving the Management of Agitation in the Elderly:  Results of New Research" in San Diego, California.  The symposium provided 1.5 CME credits for the attendees, and thus could not be promotional.  Abbott supported the lunch symposium through an educational grant.  The presentation discussed the off-label use of Depakote® for the treatment of agitation and aggression associated with dementia.  Abbott sales representatives (including Relator Spetter) attended the lunch symposium.

### 12.     Andrew Weinberg, M.D., C.M.D., F.A.C.P.

258.     On March 21, 2002, Dr. Andrew Weinberg (Associate Professor of Medicine, Wesley Woods Geriatric Hospital at Emory University in Atlanta) chaired a lunch symposium entitled "Quality of Life:  Mood Stabilizers in Long-Term Care" which was held at the American Medical Directors Association conference in San Diego, California.  The symposium provided 1.5 CME credits for the attendees, and thus could not be promotional.  Abbott supported the lunch symposium through an educational grant.  The sponsor was ABcomm.  Among the representations was that the Depakote® Products were "effective in a broad range of psychiatric conditions characterized by agitation" and had been "used successfully to treat agitation associated with dementia." The symposium included discussions of the off-label use of Depakote® for the treatment of agitation and aggression associated with dementia.  Abbott sales representatives (including Relator Spetter) attended the lunch symposium.

### K.     QUOTA AND BONUS PROGRAMS TO INDUCE SALES TO DOCTORS AND FACILITIES WHO DO NOT USE THE DEPAKOTE® PRODUCTS ON-LABEL

FILED UNDER SEAL
133788.00601/36035820v.6

259. Moreover, Abbott's Depakote® Products sales strategy included quota and bonus programs that motivated the Sales Force to sell to doctors who could not treat their patients using the Depakote® Products on-label. Abbott knew that these programs created a working environment that was conducive to promoting the Depakote® Products for as many uses and as wide a patient base as possible. The quota and bonus programs were instituted immediately upon the LTC Sales Force formation in 1998 and applied to sales representatives, District Managers, Regional Managers, and Vice Presidents.

260. Abbott's quota system required the Depakote® Products LTC Sales Force to detail any physician on their call lists (regardless of specialty) and awarded them with bonuses based on sales of the Depakote® Products. From the outset, in 1998, the only way the LTC Sales Force could meet the quotas that were set for them was by promoting the Depakote® Products off label.

261. The prescribers Abbott included in its quota and bonus programs were doctors who would not normally treat patients with the Depakote® Products' approved indications. These doctors included geriatric psychiatrists, geriatricians, primary care physicians, internal medicine physicians, and nursing home medical directors. While these doctors may have, on rare occasions, used the Depakote® Products on-label for the treatment of epilepsy and/or bipolar disorder [there were very few bipolar patients in nursing homes], the vast majority of these physicians would only use the drugs off-label.

262. At various times material hereto, Defendant Abbott's LTC Sales Force ran bonus programs called "SPIFFS" ("Special Performance Incentives for Field Sales") to incentivize sales representatives to increase the off-label use of the Depakote® Products. A "spiff" is the term Abbott used for the sum paid to a sales representative to motivate him or her to push

93

Abbott's drug products. One example of a spiff program which required the LTC Sales Force to grow the off-label use of the Depakote® Products was an "SAE 10K Strong Finish Spiff" offered during the last quarter of December 2005. The 2005 Spiff contest was "designed to increase total Depakote prescriptions in the LTC channel for a strong finish in 2005. . . ." All sales representatives, district managers, and regional managers were ranked nationally and measured according to their growth in total sales of the Depakote® Products with awards of up to $10,000 each for the winners. Given the limited on-label market in the LTC channel for treatment of bipolar, epilepsy, and/or migraines, the only way the Sales Force could increase sales was through the off-label promotion of the Depakote® Products.

263. Abbott's quota and bonus programs also influenced the selection of speakers (who were selected by the Sales Force, District Managers, Regional Managers, and Vice Presidents) based on their ability to increase off-label sales, which would thereby boost quota and bonus scores.

264. The quota and bonus program rewarded sales representatives for increasing off-label sales. One such quota and bonus program initiated on May 13, 2003 for all the LTC Sales Force was entitled "Over the Edge," and incentivized the sales representatives to go "into uncharted regions of sales success in your territory." For the months of May through August of 2003, sales representatives could earn cash awards by going "Over the Edge" in their promotions. The materials to the Sales Force explain that sales representatives had taken their territories "[t]o the edge" and "[n]ow's the time to go . . . 'Over the Edge.'"

## L. SALES REPRESENTATIVES SOLICITED MEDICAL EDUCATION REQUESTS FOR OFF-LABEL INFORMATION ABOUT THE DEPAKOTE® PRODUCTS

265. One of the ways that Abbott dramatically increased the off-label promotion of the Depakote® Products was by manipulating requests for Medical Education Requests from the

94

Abbott Medical Information Department. A "Medical Education Request" is Abbott's in-house

term for a physician request for off-label information for one of Abbott's drugs – in this case, the

Depakote® Products.

266.    Abbott senior sales management encouraged representatives to solicit Medical

Education Requests and make it appear that physicians had on their own asked for this

information even though the sales representative had solicited the request.

267.    Abbott management condoned, in fact encouraged, this practice for years for the

Depakote® Products, and even ran sales contests to reward the sales representative who could

get the most Medical Education Requests. As a result, thousands of Medical Education Requests

for off-label information about the Depakote® Products were improperly solicited from

physicians.

268.    In one contest in October 2001, sales representatives were to solicit doctors to ask

for information about the Casey study on the efficacy of Depakote® off-label to treat psychotic

symptoms of schizophrenia and the Mangi study on the neuroprotective effects of Depakote®.

Sales representatives were to use a "Fast Fax Service" to submit physician requests they had

solicited. During the month of the contest, at the direction of his management, Relator Spetter

submitted forty-one such Fast Fax requests he had solicited from physicians concerning these

off-label studies to Abbott's Medical Department, which then sent these physicians the off-label

materials. For example, off-label materials concerning the Casey and Manji studies were sent by

Abbott on April 2, 2002 to Dr. Michael Krastins, M.D., 2 Coronet Court, Schenectady, New York

12309 and on April 4, 2002 to Dr. Stanley Louie, DO, 2511 Logan Street, Selma, California 93662.

269.    Abbott knew the solicited Medical Education Requests constituted off-label

promotion and were against the law, but nonetheless continued the practice because doing so

FILED UNDER SEAL
133788.00601/36035820v.6

increased sales of the Depakote® Products. The use of solicited Medical Education Requests as a way to promote off label use has been a widespread, systemic problem at Abbott and part of the corporate culture, which encourages increasing sales by any means.

## M. ABBOTT DEVELOPED PAID "KEY OPINION LEADERS" TO WRITE PATIENT "STANDING ORDERS," WHICH IMPROPERLY RECOMMENDED THE OFF-LABEL USE OF THE DEPAKOTE® PRODUCTS

270. Another prong of the nationwide fraudulent scheme was that Abbott's LTC Sales Force developed relationships with KOLs as "Product Champions" for the off-label use of the Depakote® Products. These KOLs were chosen by the LTC Sales Force from the list of the top physicians writing prescriptions for the Depakote® Products. These KOLs were to develop "protocols" recommending the first-line, off-label use of the Depakote® Products to treat agitation and aggression in the elderly demented patient.

271. Standing order programs authorize nurses and pharmacists to administer medications according to an institution or physician-approved protocol without a physician's exam. Standing order programs are used in inpatient and outpatient facilities, long-term-care facilities, assisted living facilities, correctional facilities, pharmacies, and home health-care agencies.

272. Defendant Abbott's LTC Sales Force used form standing orders which the company had funded as part of their sales details to encourage other health care professionals to adopt similar standing orders. The standing orders were particularly important since there was no available dosing information healthcare professionals could use in prescribing the Depakote® Products off-label. The standing orders allowed the Depakote® Products to be used off-label— as a rapid stabilization for the treatment of mania, for the control of agitation and aggression in

96

FILED UNDER SEAL
1337880060126035820v6

the elderly demented patient, and for the replacement of antipsychotic drugs and stabilization of agitation/aggression in geriatric patients—*without first requiring a physician exam*.

273.    One such protocol was prepared by Alan Gruber, Ph.D. and Charles R. Morin, M.D.  According to this standing order, all geriatric patients diagnosed with dementia who displayed agitation, disruptive behavior, aggression and distress as part of their symptomatology were to routinely receive Depakote® *without first seeing a physician.*  The standing order was placed in all applicable patient charts.  On information and belief, Drs. Gruber and Morin were Abbott-paid consultants.  Their standing order was adopted by Abbott KOLs throughout the United States for use in treating patients.  For example, it was adopted by Robert S. Yuhas, M.D., Solana Beach, California, and by Daniel J. Beavers, D.O., Vancouver, Washington for use with their patients.

274.    Another standing order prepared by an Abbott KOL was done by James Randy Mervis, M.D., from UCLA School of Medicine, Geropsychiatry Consultative Services, Sepulveda Veteran's Administration Medical Center.   Dr. Mervis was viewed as a highly influential physician, and was a regular Abbott speaker and consultant.  Dr. Mervis' standing order, which was entitled "Using Depakote As a Treatment to Control the Agitation Associated with Dementia," recommends Depakote® for the treatment of Alzheimer's disease, vascular dementia, Lewy Body disease, frontal lobe dementia, Parkinson's disease, and other neurological disorders.  The standing order also recommended that Depakote® be used to treat intermittent explosive disorder, PTSD, and uncontrolled extreme anxiety and panic.  All of these uses are off-label.

N.    **ABBOTT PROMOTED THE OFF-LABEL USE OF THE DEPAKOTE® PRODUCTS THROUGH GRASSROOTS ORGANIZATIONS**

97

275.     Among the strategies intentionally designed to obscure the actual sources and amounts of funding for promotional activities, drug manufacturers have developed relationships with various "front organizations"—*i.e.*, industry-funded grassroots, consumer advocacy, research, and educational organizations whose primary goal is to promote marketing, influence regulations, or advance other industry interests.

276.     Abbott utilized non-profit organizations (such as the Alzheimer's Foundation of America) as front organizations to further its own self interest of increasing market share for the Depakote® Products.  Abbott's funding and partnering with the AFA and/or its affiliates was designed to accomplish through a non-profit organization what Abbott could not do on its own: giving the appearance of independent analysis and a grassroots movement encouraging FDA approval and expanding the use, including unapproved uses, for the Depakote® Products.

### O.     ABBOTT USED PHYSICIAN QUESTIONNAIRES TO SOLICIT INFORMATION FOR ITS OFF-LABEL PROMOTION

277.     Another part of the Fraudulent Marketing Scheme was questionnaires Abbott required its LTC Sales Force to use in soliciting information concerning the off-label use of the Depakote® Products.  For example, in November 2001, Relator Spetter was required to send a questionnaire to all the doctors on his call list, asking (*inter alia*) what drugs they preferred for behavior management in assisted living and long-term care facilities.  The responses to the questionnaire were then used as part of Abbott's Fraudulent Marketing Scheme to determine which physicians they could promote the Depakote® Products off-label.

278.     Several years later, sales representatives in Relator Spetter's region sent physician questionnaires to physician on their call lists.  Among the questions asked was a question about what drugs the doctors used to treat aggressive patients in nursing homes:

Which classes of drugs are you most comfortable using for an aggressive resident?

98

A. Benzodiazepines such as Ativan
B. Conventional antipsychotics such as Haldol
C. Mood stabilizers such as Depakote
D. Newer antipsychotics such as Risperdol or Zyprexa
E. Other

Once Abbott obtained responses to the physician questionnaires, they were then used by

Abbott's Sales Force in order to target its illegal promotion at physicians who would be receptive

to its off-label message.

## IX. ABBOTT'S FRAUDULENT MARKETING SCHEME: OTHER OFF-LABEL PROMOTION FOR PATIENTS TREATED IN LONG-TERM CARE FACILITIES

### A. ABBOTT PROMOTED THE NEUROPROTECTIVE EFFECTS OF THE DEPAKOTE® PRODUCTS TO TREAT MOOD DISORDERS, INCLUDING ALZHEIMER'S DISEASE

279. The "scientific evidence" supporting off-label use of the Depakote® Products

derived not from unbiased scientific inquiry, but rather from pre-determined, readily marketable

"key messages," carefully crafted by Abbott. One such key message was the neuroprotective

effects of the Depakote® Products in the treatment of Alzheimer's disease and other mood

disorders. That is, Abbott regularly promoted what it claimed was the ability of the Depakote®

Products to play a major role in the inhibition of Alzheimer's disease and vascular dementia.

280. Abbott trained its LTC Sales Force to make the promotion of the neuroprotective

effects of the Depakote® Products a centerpiece of its Fraudulent Marketing Scheme. One key

promotional tool used by the LTC Sales Force in this off-label detail was the Manji article. *See*

Manji*, et al.*, *Neuroplasticity and cellular resilience in mood disorders*, 5 MOLECULAR

PSYCHIATRY 578 (2000). Not only was this not a peer-reviewed, double-blind study, it was only

a review of recent studies which "suggest[ed]" that the Depakote® Products exhibited

neuroprotective effects. Nonetheless, the Manji article was used because it supported Abbott's

off-label marketing message. That message became so ingrained in the LTC Sales Force that

99

Relator Spetter's district even nicknamed itself "The Neuroprotectors" and made team T-shirts with that name on them.

281.    Abbott regularly sponsored speaker programs and CMEs at which its paid presenters openly touted the role of the Depakote Products® in neuroprotection.  One event Abbott sponsored was a CME Lunch Symposium entitled "Quality of Life:  Mood Stabilizers in Long-Term Care," which took place at the 25th Annual American Medical Directors Association ("AMDA") Convention on March 21, 2002 in San Diego, California.  AMDA is a trade association of medical directors, attending physicians, and other healthcare professionals practicing in long-term care facilities.  The speakers at the event were Andrew Weinberg, M.D., Anton Porsteinsson, M.D., and Thomas Snader, Pharm.D.  Abbott sponsored the event through an unrestricted educational grant to ABcomm, Inc.  Each of the presentations was off-label, promotional, and included information on the supposed neuroprotective features of the Depakote® Products.  For example, Snader presented a slide which stated the Depakote® Products were "Theoretically Attractive" in "[c]hanging neuron architecture (neuroprotective)." Porsteinsson presented a slide which stated that one of the "[p]ossible" mechanisms for the Depakote® Products was "neuroprotection."  Weinberg told attendees that doses of Depakote in excess of 500 milligrams per day resulted in increased "neuroprotective effects."

282.    Abbott regularly held advisory boards at which it promoted the neuroprotective effects, as well as other off-label uses, of the Depakote® Products to its most influential KOLs and high-prescribing physicians of the Depakote® Products.  The physicians selected to participate in these advisory boards were selected by Abbott sales representatives in order to reward past participation in, as well as encourage future participation in, the Company's Fraudulent Marketing Scheme.  These advisory boards were designed so that they appeared as

100

forums in which Abbott could exchange information with healthcare professionals with expertise in using the Depakote® Products. In practice, however, they were thinly-veiled marketing events intended to promote off-label uses of the Depakote® Products, to compensate doctors for their loyalty to the Depakote® Products®, and/or to persuade physicians to switch patients from competing drugs to the Depakote® Products®. Tellingly, these advisory boards were run by Abbott's Marketing Department rather than its medical affairs division, and physicians were nominated to attend by the company's sales staff based on the fact that they had written, or had the potential to write, large numbers of prescriptions for the Depakote® Products. Thus, Abbott used the advisory boards as an incentive to encourage doctors to write off-label prescriptions for the Depakote® Products®.

283.    One such advisory board was the Psychiatry Consultant Meeting held on August 4-5, 2006 at the Park Hyatt Hotel in Los Angeles, California. Abbott invited some 98 physicians to this advisory board, including a number of its KOLs and other potential high-prescribing physicians, all of whom were offered $750 plus expenses to attend the event. Invitations were sent by Jim Pellettiere, the Product Manager in Abbott's Marketing Department, and each physician who chose to attend signed a "Professional Services Agreement" with Abbott. The invitees included two doctors selected by Relator Spetter to reward their past prescribing and/or because of their potential to prescribe more of the Depakote® Products: Dr. Bradley Sanders, a psychiatrist from San Diego and the largest user of the Depakote® Products in Relator Spetter's district, and Dr. Samuel Etchie, a psychiatrist from La Mesa, California. Abbott retained SCS Healthcare Marketing, Inc., based in Mahway, New Jersey, to run the event. The SCS website states that it is a "[f]ull-service marketing communication company providing innovative

101

relationship-based programs *designed to enhance brand image and increase market share*"
(emphasis added).  Among the topics discussed was the "the latest evidence of neuroprotection."

### B.  ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS OFF-LABEL FOR THE TREATMENT OF PSYCHOSIS WITH DEMENTIA

284.    Another part of the Fraudulent Marketing Scheme entailed promotion of the
Depakote® Products as an alternative to atypical antipsychotics for the treatment of psychosis
for patients suffering from dementia.  A key tool used by the LTC Sales Force in this off-label
promotional effort was the "Pocket Guide," sponsored by Abbott, and discussed *supra* at
paragraphs 132 through 135 and 138 through 140.  Specifically, the "Pocket Guide" at page 48
references the use of the Depakote® Products as an alternative to Risperdal® and Seroquel® in
the long-term treatment of agitation associated with psychosis.  Abbott sales representatives,
including Relator Spetter, were trained to, and did, use the "Pocket Guide" for the off-label
promotion of the Depakote® Products for the treatment of psychosis.

285.    Beginning in February 2000, the message that the Depakote® Products
constituted an alternative to atypical antipsychotics was made a part of Abbott's nationwide
promotional effort, which it sponsored through Defendant Omnicare, discussed *infra* at
paragraphs 388 through 414.  For example, in a promotional speaker program entitled
"Treatment of Behavior Symptoms in the Elderly with Dementia," presented by Thomas Cali,
Pharm.D. to Omnicare healthcare professionals, Cali used the Abbott-funded Consensus
Guidelines (*see supra* paragraphs 128 through 131) to recommend the Depakote® Products as
options for the treatment of agitation associated with psychosis.  In addition, as part of the
Omnicare program, Abbott produced a version of the Consensus Guidelines which included the
recommendation that the Depakote® Products be used as an alternative to Risperdal® for the

102

long-term treatment of psychosis. No clinical support is cited anywhere in these materials for the off-label use of the Depakote® Products to treat psychosis associated with dementia.

286. Abbott regularly retained speakers who promoted the off-label use of Depakote® as treat psychosis. For example, starting in January 2003, speakers were provided with an Abbott-approved slide deck, entitled "Utilization of Depakote (divalproex sodium) in Bipolar Disorder: Focus on Psychosis." Among the conclusions speakers were to tout were that "[s]tudies have shown divalproex efficacy in psychotic subgroups" and "Divalproex has proven to be both safe and efficacious" in the treatment of psychosis. However, the studies cited as support for these conclusions actually were largely negative (Bowden, *et al., see infra* at paragraph 291; Casey, *et al., see infra* at paragraps 298 through 307), or actually found that Depakote® was less effective than alternative therapy. *See* Tohen, *et al., Olanzapine Versus Divalproex in the Treatment of Acute Mania,* 159 AMERICAN JOURNAL OF PSYCHIATRY 1011 (2002) (finding that Zyprexa® was more effective than Depakote®, but that Zyprexa® had more adverse events).

287. A "Special Report," entitled "Improving Quality of Life: Use of Mood Stabilizers in Senior Care" and "supported" by an unrestricted educational grant from Abbott, provides an example of how Abbott disseminated its off-label message about the treatment of psychosis associated with dementia. The report summarizes presentations given at meetings of the American Association of Geriatric Psychiatry ("AAGP") and AMDA, which focus on the "appropriate use of mood stabilizers in geriatric patients." Among the conclusions reached by the author is that "preliminary studies show that mood stabilizers [like the Depakote® Products] present a promising alternative to antipsychotics...."

103

288.     Both Depakote® and Depakote ER® only achieved FDA approval for indications corresponding to acute treatment of bipolar disorder. Nonetheless, in order to grow sales, Abbott regularly engaged in off-label promotion of the Depakote® Products for the maintenance treatment of bipolar disorder.

289.     Abbott never received FDA approval for the indication of bipolar maintenance, though some atypical antipsychotics and other anticonvulsants did receive this approval. Depakote®'s lack of an approval for bipolar maintenance became a competitive talking point for Abbott representatives, since even without the FDA-approved indication, it was well known that Depakote® was used for maintenance therapy. When doctors asked Abbott sales representatives whether Depakote® had the maintenance indication, representatives were coached to use the standard response: "No. But, Doctor, what has been your experience using Depakote for maintenance? Have you found in your experience that Depakote works well for these patients?" Sales representatives were thus coached to promote the maintenance use of Depakote® despite no FDA indication for such use.

290.     Abbott regularly retained speakers who promoted the off-label use of Depakote® as a maintenance treatment for bipolar disorder. For example, starting in January 2003, speakers were provided with an Abbott-approved slide deck entitled "Evolution of Depakote® and Depakote® ER" for use in the off-label promotion of bipolar maintenance therapy. Slide 24 of this presentation states: "Conclusion: Potential Role of Depakote® ER in Bipolar Maintenance Therapy." Nowhere in the slide deck is there clinical support for the conclusion.

291.     Abbott promoted the Depakote® Products for the maintenance treatment of bipolar disorder despite the fact that the Divalproex Maintenance Study Group it had

104

commissioned to study this use had found it no more effective than the placebo or lithium. *See*

Bowden, *et al., A Randomized, Placebo-Controlled 12-Month Trial of Divalproex and Lithium in*

*Treatment of Patients With Bipolar 1 Disorder,* 57 ARCHIVES OF GENERAL PSYCHIATRY 481

(2000).

## D. ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS FOR THE OFF-LABEL TREATMENT OF EPISODIC AGITATION OR "SUNDOWNING" IN THE ELDERLY

292.     In order to grow sales, Abbott regularly engaged in off-label promotion of the

Depakote® Products for the treatment of "sundowning" in the elderly.   Also known as

"Sundown Syndrome," sundowning refers to behavioral changes that often occur in the late

afternoon or evening in people with Alzheimer's disease and similar conditions.  These

behavioral changes may take the form of aggression, agitation, delusions, hallucinations,

paranoia, increased disorientation, or pacing and wandering about.

293.     Promotion of the Depakote® Products as an alternative to antipsychotics to treat

sundowning in the elderly became another part of the Fraudulent Marketing Scheme.  A key tool

used by the LTC Sales Force in doing so was the "Pocket Guide," sponsored by Abbott, and

discussed *supra* at paragraphs 132 through 135 and 138 through 140.  Specifically, the "Pocket

Guide" at page 49 references the use of Depakote® Products in first-line treatment of

sundowning.  Abbott sales representatives, including Relator Spetter, were trained to, and did,

use the "Pocket Guide" for the off-label promotion of treatment of sundowning in the elderly.

294.     Beginning in February 2000, the promotion of the Depakote® Products for the

treatment of sundowning in the elderly was made a part of Abbott's nationwide promotional

effort, which it sponsored as part of the Institutional Defendants' Fraudulent Scheme through

Defendant Omnicare, discussed *infra* at paragraphs 388 through 414.  For example, in the

promotional speaker program, entitled "Treatment of Behavior Symptoms in the Elderly with

105

Dementia," presented by Thomas Cali, Pharm. D. to Omnicare healthcare professionals, in slide 72 Cali used the Abbott-funded Consensus Guidelines (*see supra* paragraphs 128 through 131) to recommend the Depakote® Products as options for treatment of sundowning. In addition, as part of the Omnicare program, Abbott presented a version of the Consensus Guidelines, which included the recommendation that the Depakote® Products be used for the long-term treatment of sundowning. No clinical support is cited anywhere in these materials for the off-label use of the Depakote® Products to treat sundowning.

### E. ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS FOR THE OFF-LABEL TREATMENT OF REDUCING FALLS IN THE ELDERLY

295.  Since at least the year 2000, in order to increase sales, Abbott's sales representatives regularly promoted to health care professionals that Depakote® would reduce falls in the elderly. Abbott did so not only despite the lack of an FDA approval for this indication, but also despite the absence of any convincing clinical support as to Depakote®'s effectiveness at reducing falls in the elderly. The primary tool used by Abbott in this promotional effort was the Frenchman study, which stated that Depakote® could reduce falls in the elderly. I. Barton Frenchman, *et al.*, *Effect of Treatment With Divalproex Sodium and Lorazepam in Residents of Long Term Care Facilities with Dementia-Related Anxiety or Agitation: Retrospective Chart Review*, 61 CURRENT THERAPEUTIC RESEARCH 621 (2000). The Frenchman study, however, was not a double-blind, placebo-controlled study, but rather a retrospective study. As such, it did not even randomly allocate the treatment groups. Nonetheless, Abbott LTC Sales Reps were trained to use its conclusions in their detail.

296.  The message that the Depakote® Products could reduce falls in the elderly was made a part of the Abbott-sponsored nationwide promotion in a speaker program given by Thomas C. Snader, Pharm.D., entitled "Treatment of Behavioral Symptoms in the Elderly: The

FILED UNDER SEAL
133788.00601/36035820v.6

Impact on Quality of Life." Snader explained the Frenchman conclusions and that Depakote®
could be used to reduce falls in the elderly, despite no such FDA approval.

## X.  ABBOTT UNLAWFULLY PROMOTED THE DEPAKOTE® PRODUCTS AN AN ADJUNCTIVE THERAPY FOR TREATMENT OF SCHIZOPHRENIA IN LONG-TERM CARE FACILITIES AND ELSEWHERE

297.    Beginning at least as early as 2000, Abbott began a strategic focus of promoting
the Depakote® Products off-label for the adjunctive treatment of schizophrenia.

### A.  USE OF THE FLAWED CASEY STUDY TO PROMOTE THE DEPAKOTE® PRODUCTS FOR THE ADJUNCTIVE TREATMENT OF SCHIZOPHRENIA

298.    Beginning at least as early as 2001, Abbott's Sales Force used the Casey, *et al.*
poster entitled *Improved Antipsychotic Effect of Divalproex Combined with Risperidone or
Olanzapine for Schizophrenia* in order to promote Depakote® for the off-label adjunctive
treatment of schizophrenia. This poster was sponsored by Abbott at the World Assembly of
Mental Health, 26th Biennial Congress of the World Federation of Mental Health, which was
held in Vancouver, British Columbia on July 22-27, 2001. The Abbott-sponsored Casey poster
touted that the Depakote® Products, when added to Zyprexa® or Risperdal®, "significantly
enhance[d] antipsychotic efficacy in patients with schizophrenia." The Depakote® Sales Force
regularly used the Casey poster in its promotion.

299.    Later  in 2003, the full Casey study was published in the journal
Neuropsychopharmacology. Daniel E Casey, *et al.*, *Effect of Divalproex Combined with
Olanzapine or Risperidone in Patients with an Acute Exacerbation of Schizophrenia*, 28
NEUROPSYCHOPHARMACOLOGY 182 (2003). The Casey Study was funded by Abbott. Relator
Spetter and the Sales Force were provided thousands of copies of the Casey Study which they
distributed to physicians in order to promote the Depakote® Products as an adjunctive treatment
for schizophrenia. The study's lead author, Daniel E. Casey, is the Associate Director of

107

Research at the Portland VA Medical Center in Portland, Oregon. The Casey Study abstract concluded that "[t]reatment with divalproex in combination with an atypical antipsychotic agent *resulted in earlier improvements in a range of psychotic symptoms among acutely hospitalized patients with schizophrenia*" (emphasis added). This message became the focus of Abbott's aggressive campaign to grow off-label sales of the Depakote® Products.

300. Sales representatives, including Relator Spetter, were to (and did) use the Casey study daily until well into 2006 in promotions to psychiatrists and other healthcare professionals as evidence that "a preliminary but growing body of literature suggests a role" for the Depakote® Products in the adjunctive treatment of schizophrenia.

301. In promotional programs that took place throughout the United States from at least 2001 until well into 2006, Abbott retained speakers to claim, supported by Abbott-prepared slides, that the results of the Casey Study supported the off-label use of Depakote® in the adjunctive treatment of schizophrenia:

> Divalproex enhances antipsychotic efficacy in schizophrenia when used in combination with traditional antipsychotic therapy as evidenced by improvement in positive symptoms, negative symptoms, and general psychopathology. These differences can be observed as early as day 3 of treatment which may reduce inpatient stays for treatment of schizophrenia. The improved outcomes in this difficult to treat patient population along with the reduced time of hospitalization can have an economic impact on total healthcare costs involved with managing the patient with schizophrenia.

Speakers were to extol the benefits of Depakote® to treat schizophrenia:

> Anticonvulsants have a growing role in treating psychosis. They are effective in the treatment of schizoaffective disorder and schizophrenia when used in combination with antipsychotics. Divalproex sodium is the most well studied of these agents. *Research suggests benefit is gained when divalproex is added to current therapy as it has a consistent pattern of improvement in positive and negative symptoms, hostility, and aggression.* Divalproex can be used in acute exacerbation and maintenance treatment in schizophrenia and schizoaffective disorders.

108

> Divalproex is well tolerated and has no additional side effect burden, making it a
> good combination treatment option for schizophrenia.

(emphasis added).

302.    Abbott widely used the Casey Study to promote the use of Depakote® for the

treatment of schizophrenia. For example, in February 2003, Abbott distributed a supplement to

the *Psychiatric Times* magazine entitled "Bipolar Disorder & Impulsive Spectrum Letter," which

included an article entitled "Anticonvulsant Augmentation Enhances Antipsychotic Effects."

This supplement was prepared by Kenneth J. Bender, Pharm.D, M.A., a writer for CME, Inc.,

Irvine, California, with "support by an unrestricted educational grant from Abbott Laboratories."

According to the supplement,

> [p]reliminary indications that divalproex (Depakote) can augment antipsychotic
> effect in schizophrenia are not supported by results from a controlled, multi-center
> trial comparing antipsychotic monotherapy with olanzapine (Zyprexa) or
> risperidone (Risperdal) to each antipsychotic combined with divalproex (Casey *et
> al.*, 2002). . . . The apparent utility of divalproex to heighten and hasten
> antipsychotic effect was projected to reduce the cost of treating patients with
> acute schizophrenia in the recent symposium of the California Medi-Cal Drug
> Utilization Review Board, 'Fiscal Pharmacology of the Atypical Antipsychotics'
> (Stahl, 2001). The addition of divalproex was considered to be less expensive and
> have greater efficacy than would increasing antipsychotic dose or employing
> multiple antipsychotics.

303.    Abbott regularly used its Neuroscience Research Scientists ("NRSs") to give

speaker programs which promoted the Casey study results for non-approved uses of the

Depakote® Products to treat schizophrenia. Although the use of Abbott NRSs to promote the

Depakote® Products off-label was against Abbott policy, doing so offered a way for Abbott to

make its unlawful promotional activities of the Depakote® Products appear lawful. Although

NRS interaction with health care professionals was not supposed to be promotional, such activity

became an accountability for Sales Account Executives. For example, the Abbott SAE

FILED UNDER SEAL

Performance Model, Account Selling section 2.3.11, states that sales representatives were expected to identify areas in which Abbott could "best utilize" NRSs "in the selling process." One such NRS who engaged in the off-label promotion of Depakote® to treat schizophrenia was Mahtab Jafari, Ph.D., who worked for Abbott from 2001 to 2004. Dr. Jarari did research with Dr. Casey on the metabolic effects of combining Depakote® with Zyprexa® or Risperal® in the treatment of schizophrenia and gave numerous presentations concerning the combination. *See* Jafari, *et al.*, *Divalproex Adjunctive Therapy Lowers Elevated Cholesterol Associated with Olanzapine and Risperidone Treatment of Schizophrenia*, Paper presented at the International Congress on Schizophrenia Research in Colorado Springs, Colorado (March 2003). For example, on March 14, 2002, Dr. Jafari gave a presentation entitled "The Role of Mood Stabilizers in Schizophrenia" for Grand Rounds at the University of California, in which she openly discussed the off-label use of Depakote® as an adjunctive treatment for schizophrenia.

304.    Additionally, Abbott sponsored CME events designed to feature the Casey study findings, which promoted the off-label use of Depakote® for the treatment of schizophrenia. For example, in 2003 Abbott sponsored a CME through ABcomm, Inc. entitled "A Mood Stabilizer as Combination Therapy in the Treatment of Schizophrenia." During the CME, Dr. Casey was asked various questions concerning the study results, including what role Depakote® had for the treatment of acute schizophrenia. Per Dr. Casey's response, "[t]he results of the study are groundbreaking and support the role of adding divalproex for the treatment of schizophrenia…. Based on the results of the study, divalproex is an excellent choice for the treatment of acute exacerbation of schizophrenia in combination with an atypical antipsychotic." With regard to any potential limitations of the study, Dr. Casey mentioned nothing beyond statements as to which types of patients were excluded and the fact that the Study examined only acute patients.

110

305.     Despite the overwhelmingly positive statements about the Casey study made by Abbott's sales representatives, NRSs, and paid promotional speakers, as well as in its sponsored literature, serious concerns existed as to whether the study could support such claims.  For example, a letter to the editors of Neuropsychopharmacology strongly criticized the Casey study:

> The study was not designed or powered to detect equivalency between the two antipsychotics yet combined them in the efficacy analysis. . . .  At the same time, the authors emphasize the difference between the two drugs in the safety analysis. The net result is that the safety analysis has less power than the efficacy analysis. If instead the groups are combined for the analysis of adverse events, *there is significantly more somnolence among patients treated with divalproex adjunctive therapy.* . . .

> This, the largest randomized control trial to date for the use of divalproex in schizophrenia is an important study. The authors discuss several possible explanations for the failure to find benefit at 28 days, but do not entertain the possibility that it was a 'true negative' or that any initial benefit was transient or merely random. One alternative explanation suggested by the data is that accelerated improvement in symptom rating scores is achieved through nonspecific sedation. Was significant improvement found among patients without somnolence?

> Regardless, the failure of the study to attain its primary end point is a major finding and should have been included in the abstract. This negative finding has important clinical implications. Added to the mixed results of smaller previous randomized trials . . . , *it further weakens support for the widespread use of divalproex for chronic schizophrenia.*

Laura S. Boylan and Daniel L. Labovitz, *Unbalanced Statistical Analysis of Combined Divalproex and Antipsychotic Therapy for Schizophrenia*, 29 NEUROPSYCHOPHARMACOLOGY 636 (2004) (emphasis added).

306.     Adding further doubts to the Casey study's conclusions, a follow-on study sponsored by Abbott found mixed results.  This 2004 study by Citrome, *et al.*, found that the adding Depakote ER® to either Zyprexa® or Risperdal® only reduced hostility in patients suffering from schizophrenia on days three and seven, and the effect on day seven was "small."

111

Furthermore, the Citrome study found there was no statistically significant difference between treatment groups following the first week, and concluded that "[f]urther double-blind, controlled research on the use of divalproex in reducing hostility among patients with schizophrenia is needed." Citrome, *et al.*, *Adjunctive Divalproex and Hostility Among Patients with Schizophrenia Receiving Olanzapine or Risperidone*, 55 Psychiatric Services 290 (2004).

307. Finally, in 2009, another Abbott-sponsored study with Casey as the lead investigator found that "combination therapy failed to show an advantage over antipsychotic monotherapy at day 84." *See* Casey, *et al.*, *Divalproex ER Combined with Olanzapine or Risperidone for Treatment of Acute Exacerbations of Schizophrenia*, 34 NEUROPSYCHOPHARMACOLOGY 1330 (2009). The study concluded that due to the "increased safety risks associated with combination therapy and the conflicting data regarding its efficacy," the use of Depakote® ER as an adjunct to either Zyprexa® or Risperdal® was "not strongly supported."

### B. ABBOTT SPONSORED SPEAKER PROGRAMS AND CMEs ON THE OFF-LABEL USE OF THE DEPAKOTE® PRODUCTS IN THE ADJUNCTIVE TREATMENT OF SCHIZOPHRENIA

308. Abbott regularly sponsored speaker programs and CMEs at which its paid presenters openly touted the role of the Depakote Products® in the adjunctive treatment of schizophrenia. For example, Abbott engaged CENE ("Council for Excellence in Neuroscience Education"), a division of Access-Medical, LLC, Chicago, IL 60631, to provide interactive CME programs for psychiatrists, neurologists, and long-term care specialists on the use of the Depakote® Products to treat children and adolescents. One such CENE program entitled "Current Trends in the Management of Psychosis" was posted on the www.cene.com website in June 2001. The slides were prepared by Anil Vootkur, PharmD, a writer for Access-Medical,

112

and were made available for Abbott's customers in order to provide them with information

concerning the off-label prescribing of Depakote® in the off-label treatment of psychosis in

schizophrenia, and concludes that "[a]nticonvulsants have a growing role in treating psychosis"

including schizophrenia and that Depakote® is the "most well studied" anticonvulsant to use in

this setting.

309.    Abbott also engaged CENE to provide a program entitled "Clinical Trial Results

of Divalproex Sodium (Depakote® Delayed-Release) in the Treatment of Psychosis with

Schizophrenia." The program was posted on the www.cene.com website in October 2001. The

slides were prepared by Anil Vootkur, PharmD, a writer for Access-Medical, and made available

for Abbott's speakers and customers. The slides examined the Casey Study results, and

concluded (*inter alia*) that "[o]verall, patients receiving divalproex had significantly greater

improvement in PANSS Total Score than patients receiving monotherapy," that they had

"[s]ignificant treatment differences occurred as early as Day 3," and that the "[p]ositive

symptoms of schizophrenia improved." There is nothing in the CENE slides concerning the fact

that the Casey Study had failed to meet its primary endpoint.

310.    Another event Abbott sponsored was a CME Lunch Symposium entitled "Quality

of Life: Mood Stabilizers in Long-Term Care," which took place at the American Medical

Directors Association ("AMDA") meeting on March 21, 2002. At the Symposium, Dr. Anton

Porsteinsson, an Abbott Level 1 KOL, gave an off-label presentation entitled "The Role of Mood

Stabilizers in Long-Term Care," in which he presented a series of slides discussing "Divalproex

as Adjunctive Treatment." Among his conclusions were that "[a]lternatives to antipsychotics are

needed" and that "[n]ew data about potential mechanisms of action for anticonvulsants [like the

FILED UNDER SEAL
133788.00601/36035820v.6

Depakote® Products] offers the potential of truly meaningful new research and treatment opportunities."

311.    In another CME, beginning in November 2003, Abbott sponsored a video program entitled "Emerging Data and Cost Implications:  Maximizing Synergies Between Mood Stabilizers and Atypical Antipsychotics," presented by Dr. Stephen M. Stahl, M.D., Ph.D., and Dr. Henry Nasrallah, M.D.  The program ended in October 2005.  Abbott initially offered the presentation as a live video conference throughout the United States, and thereafter provided copies of the video and hard-copy insert of accompanying slides to healthcare professionals throughout the United States.  The CME was openly off-label and encouraged attending physicians to adopt the "best practice" of combining an atypical antipsychotic and a "proven" anti-epileptic drug, Depakote®, for the treatment of schizophrenia.  Both Stahl and Nasrallah were at the time paid Abbott Consultants.

312.    The Company regularly retained speakers who promoted the off-label use of Depakote® as adjunctive treatment for schizophrenia.  For example, starting in January 2003, speakers were provided with an Abbott-approved slide deck entitled "Management and Treatment of Schizophrenia:  The Evolving Role of Depakote® (Divalproex Sodium)," to use for the off-label promotion of Depakote® as an adjunctive treatment for schizophrenia.  For example, slide 7 of the presentation stated that expert consensus guidelines frequently recommended the Depakote® Products as adjunctive agents.  Even though Abbott noted that the clinical evidence supporting such a use was minimal, coming only from small, open-label trials, speakers were nonetheless to tout the "Improved Antipsychotic Effect of Divalproex Sodium Combined with Risperidone or Olanzapine for Schizophrenia."  Indeed, speakers were to get out the message that the Depakote® Products have a "growing role" in treating schizophrenia.

114

## XI.  ABBOTT'S FRAUDULENT MARKETING SCHEME:  OTHER OFF-LABEL PROMOTION IN BOTH LONG-TERM CARE FACILITIES AND ELSEWHERE

313.    Abbott's off-label promotional activities were not limited to long-term care facilities.  In addition to the off-label promotional efforts described *supra*, which occurred nationwide but were primarily limited to LTC facilities, Abbott promoted the Depakote® Products for other off-label indications in both LTC facilities and elsewhere.

### A.  ABBOTT TARGETED MRDD FACILITIES FOR WIDESPREAD OFF-LABEL PROMOTION TO TREAT AGGRESSION WHEN RESEARCH STUDIES SHOWED THE DEPAKOTE® PRODUCTS WERE NOT EFFECTIVE FOR THIS USE

314.    Abbott's off-label marketing scheme also targeted facilities and healthcare professionals treating patients who were mentally retarded ("MR") and developmentally disabled ("DD").  Abbott referred to these patients collectively as the "MRDD Channel."  Abbott promoted the Depakote® Products to treat aggression in adults and children who were considered MR or DD, despite the fact that the FDA has never approved the Depakote® Products to treat aggression in any patient population.  Abbott's strategy intentionally targeted this vulnerable population with severe health problems to treat symptoms of aggression and agitation, despite knowledge that the Depakote® Products were not approved for this indication.

315.    According to "Market Channel Analysis" for the Depakote® Products from an Abbott 2004 Regional Business Plan, MRDD was a "targeted" channel.  Among the "Key Actions" listed to promote to MRDD:

- "Provide collaborative support to facilities serviced by [Institutional Pharmacies] that are advocates for Depakote ER."

- "Determine if we can favorably position Depakote® ER on state formularies due to needs of MRDD population."

- "Train reps to address competitor counter-detailing of Depakote's side effect profile in this population with high percentage of children (weight-gain, tremor & platelets)."

115

FILED UNDER SEAL
133788.00601/36035820v.6

316.     Abbott researched and evaluated key "influencers" and potentially high-prescribing physicians for the MRDD population.  For example, Abbott promoted the Depakote® Products to Dr. Brad Sanders of La Mesa, California.  Dr. Sanders' specialty was psychiatry, and he had an extremely high volume of psychiatric patients who were cared for in MRDD care facilities.  One of these facilities was Home of Guiding Hands, a residential facility located in El Cajon, California, which housed over 200 individuals with moderate to profound mental retardation.  Dr. Sanders was the number one psychiatric prescriber in all of San Diego County, California; as such, he became the focal point for the off-label promotion of the Depakote® Products for use in MRDD patients.

317.     Abbott's strategy also included converting MRDD patients from Depakote® to Depakote ER®.  The goal, per Abbott's Central Storm business plan, was to "maximize ER conversion in MRDD."  As with Depakote® DR, Depakote® ER also lacked FDA approval for the treatment of aggression.  For example, sales representatives used a 2004 poster by Nanette Wrobel, R.Ph, *et al., Use of Divalproex Sodium ER in the Mentally Retarded and Developmentally Disabled Population,* a retrospective chart review of MRDD patients that were switched from DR to ER.  The study was supported by Abbott, and concluded that conversion from DR to ER "was accomplished with no noticeable changes in efficacy or negative changes," hardly a ringing endorsement.

318.     And, Abbott funded "Expert Consensus Guidelines" entitled "Treatment of Psychiatric and Behavioral Problems in Individuals with Mental Retardation" ("MRDD Guidelines") published in 2004, sponsored by Postgraduate Institute and Jobson Education.  The MRDD Guideliness published what purported to be independent guidelines for doctors treating the MRDD patients.  The MRDD Guidelines were designed to create overwhelming use of

116

certain drug products by producing a set of treatment algorithms (*i.e.*, essentially step-by-step treatment decision trees) approved as first and second line treatments. For example, the MRDD Guidelines state:

> The experts recommended use of mood stabilizers/anticonvulsants for bipolar disorder (manic and depressive phases), self-injurious or aggressive behavior, and agitation, and to treat psychiatric or behavioral problems that occur in individuals with epilepsy. *Among the mood stabilizers, the experts considered divalproex the agent of choice (rated first line by 90% or more)*, followed by carbamazepine. These recommendations reflect findings in the literature. *Divalproex was found to be effective in treating aggressive, self-injurious, and disruptive behavior.*

MRDD Guidelines at 10 (emphasis added).

319.    In addition, in 2005 Abbott prepared a series of dinner programs to "educate health care providers on treating seizures in individuals with developmental disorders." The programs were entitled "Treatment of Seizures and Psychiatric Disorders in Individuals with Developmental Disabilities" and presented by Dr. Michael Smith, M.D., and included three dinner programs in New York, Houston, and in California. The CME provider videotaped these live meetings to produce an enduring piece that was distributed more widely following the program. Some 50 health care professionals attended each program.

320.    Abbott promoted the off-label MRDD use despite serious questions about whether the Depakote® Products were efficacious in the treatment of MRDD patients. For example, a study examining the effectiveness of Depakote® in the treatment of aggression in children and adolescents with pervasive developmental disorders, published in 2005, concluded that there were no statistically significant differences in outcomes between Depakote® and placebo. Hellings, *et al.*, *A Double-Blind, Placebo-Controlled Study of Valproate for Aggression in Youth with Pervasive Developmental Disorders*, 15 JOURNAL OF CHILD AND ADOLESCENT PSYCHOPHARMACOLOGY 682 (2005).

FILED UNDER SEAL
133788.00601/36035820v.6

321. The majority of MRDD patients' prescriptions drugs, including the Depakote® Products, are paid for by government programs. The Medicaid program is the single most important public-sector program in the United States for people with mental retardation and developmental disabilities. In 2002, for example, Medicaid funded 77 percent of the $34.6 billion in MRDD long-term care spending

322. As such, Abbott's off-label promotional targeting of MRDD patients resulted in numerous false and fraudulent claims, which were paid for by the United States and the *Qui Tam* States.

**B. ABBOTT TARGETED FEDERAL AND STATE GOVERNMENT-OWNED MILITARY BASES, HOSPITALS, AND CORRECTIONAL FACILITIES FOR THE ILLEGAL OFF-LABEL PROMOTION OF THE DEPAKOTE® PRODUCTS**

323. As part of its Fraudulent Marketing Scheme, Abbott specifically targeted its illegal off-label promotion at government facilities, including United States Department of Veterans Affairs ("VA") and Department of Defense ("DOD") medical facilities, such as Camp Pendleton Naval Hospital; as well as state hospitals and correctional facilities (collectively "Government Medical Facilities"). Abbott LTC sales representatives regularly promoted the Depakote® Products off-label to healthcare professionals who worked for Government Medical Facilities.

324. The interactions with these healthcare professionals who worked for Government medical facilities were subject to heightened scrutiny under the law, including specific rules such as the Veterans Health Administration Directives and the Office of Government Ethics Rules and numerous state rules governing such interactions. These rules limit the range of allowable interactions with healthcare professionals employed by the federal and state governments. As a result, sales activities that may have been permissible when conducted with non-government

118

healthcare professionals would have been prohibited under these specific federal rules when the activities were conducted with government healthcare professionals.

325. In addition, Abbott's own rules made clear that its employees could not offer any form of compensation directly or indirectly to a government employee. For example, Abbott's October 1999 Code of Business Conduct specifically stated, "[n]o employee shall directly or indirectly pay, give, offer or promise any form of bribe, gratuity, or kickback to a United States federal, state, or local government official or employee." Abbott Code of Business Conduct #34-9.

326. Nonetheless, Abbott LTC Sales and Marketing specifically targeted federal and state government healthcare professionals in order to directly and/or indirectly induce their illegal off-label prescribing of the Depakote® Products.

327. One such physician with whom Abbott developed a relationship beyond its own rules and government regulations was Dr. Randy Mervis. Abbott established Dr. Mervis as a KOL and speaker in order to induce the illegal off-label prescribing of the Depakote® Products. Dr. Mervis is Chief of Geropsychiatry Consultation Services at the Sepulveda, California Veteran's Administration Medical Center and Associate Clinical Professor of Psychiatry at UCLA School of Medicine. All interactions with Dr. Mervis would have been governed by the VA Directives and/or California conflict of interest rules. As alleged herein, Dr. Mervis was the author of standing orders which were used in Government Medical Facilities as part of the off-label use of the Depakote® Products. In addition, he was a regular speaker and KOL for Abbott. For example, on February 27, 2003, Dr. Mervis gave a presentation funded by an Abbott unrestricted educational grant on "The Role of Mood Stabilizers in Treating Behavioral Disturbances Associated with Dementia" at the Hawaii Prince Hotel. The sponsor was

119

ABcomm, Inc. and the honorarium was $1,000. The very next day (February 28, 2003), Dr. Mervis gave the same presentation (again funded by an Abbott unrestricted educational grant) at the Hawaii Prince Hotel. The sponsor was ABcomm, Inc. and the honorarium was $1,000. There were some fifty health care professionals in attendance. Both presentations discussed the off-label use of Depakote® to treat agitation and aggression in the treatment of dementia.

328.    Another example of a government employee with whom Abbott set up a KOL relationship (both as the author of standing orders and as a frequent speaker) in order to induce the illegal off-label prescribing of the Depakote® Products was Dr. Clifford M. Singer, Medical Director for the Department of Human Services, State of Oregon and Clinical Director of Geriatric Psychiatry Services, Oregon Health Sciences University. On June 5, 2000, Dr. Singer gave a presentation funded by an Abbott unrestricted educational grant on "Medical Treatment of Alzheimer's Disease and Other Dementias: Focus on Behavior Symptoms," at Morton's Restaurant in San Diego, California. ABcomm was the sponsor. The honorarium was $1,000. His presentation discussed the off-label use of Depakote® for the treatment of agitation and aggression in the treatment of dementia.

329.    Abbott conducted special speaker programs for both the DOC and the VA/DOD channels. For example, Abbott sponsored a live satellite broadcast distance learning programs at key institutional and correctional sites presented by Dr. Henry Metzner, Clinical Professor of Psychiatry, the University of Colorado Health Science Center entitled "Management of Pharmacological and Non-Pharmacological Challenges in the Correctional Section," on March 24, 2005. The program was videotaped, and available later as well. Among the off-label topics discussed were the use of the Depakote® Products to treat aggression and hostility, substance abuse, and alcohol dependence and withdrawal.

120

330.     Another distance learning program entitled "Mood Stabilizers, Multiple

Medications and Metabolics," was presented at key institutional and correctional sites in June

2005, led by Dr. Sergio Fazio, M.D. Professor of Medicine and Pathology, Co-Director Lipid

Clinic and Atherosclerosis Research Clinic, Nashville, Tennessee and Dr. Lawrence Blonde,

M.D., Director of the Oschner Diabetes Clinic Research Unit, New Orleans, Louisiana. Among

the off-label uses presented was the combination use of the Depakote® Products to treat

psychosis in the correctional setting. Some 15,000 invitations were sent out for the CME.

331.     And, Abbott sponsored another distance learning program entitled "Overall

Pharmacoeconomics: The Outcomes Behind the Dollar." The program was presented at key

institutional and correctional sites in June 2005 and led by Dr. Alan Swann, M.D., Department of

Psychiatry and Behavioral Sciences, University of Texas Medical School at Houston, and Dr. H.

Steven Moffic, M.D., Professor of Psychiatry, Medical College of Wisconsin. A videotape was

made of the presentation, which was available after the program. Some 15,000 invitations were

sent to sites, inviting them to attend. Among the off-label uses presented was the use of mood

stabilizers to in the correctional facility.

332.     And, in June 2005, Abbott sponsored special speaker training sessions conducted

by ABcomm for both the DOC and the VA/DOD marketing channels. Some 27 DOC and 14

VA/DOD attendees were flown in for meeting, and paid an honoraria for attending the speaker

training program. The DOC program was held on June 3-4, 2005 in Atlanta, Georgia, with

presentations by Dr. Robert Trestman and Dr. Alan Swann. The VA programs were also held in

June 3-4, 2005 in Atlanta with a presentation by Dr. Alan Swann and on June 10-11, 2005 in

Chicago with a presentation by Dr. Andrew Cole.

121

**C. ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS FOR THE OFF-LABEL TREATMENT OF ALCOHOL WITHDRAWAL, SUBSTANCE ABUSE WITH CO-MORBID DISORDERS, MANIA WITH SUBSTANCE ABUSE, AND ALCOHOL RELAPSE PREVENTION**

333. Beginning at least as early as 1998, Abbott began promoting the use of the Depakote® Products for the management and treatment of substance abuse in bipolar disorder. For example, in an Abbott-approved slide deck, entitled "Management and Treatment of Substance Abuse in Bipolar Disorder," first circulated in 2003 and intended for use by outside, paid promotional speakers, the Company outlined its marketing plans to promote the Depakote® Products for the treatment of:

- Alcohol withdrawal;

- Substance abuse with co-morbid disorders;

- Mania with substance abuse; and

- Alcohol relapse prevention.

These speaker slides were used in promotional speaker programs throughout the United States and summarized several small, open label studies as support for these off-label uses of Depakote®. Based on this scant evidence, the speaker slides conclude that Depakote® "is efficacious and safe in treating substance abusing patients with mood disorder."

334. One example of Abbott's planning for these off-label promotions was the 2004 Regional Business Plan for the Central Storm Region, which urged sales representatives to promote Depakote® for the treatment of bipolar patients with co-morbid substance abuse at the Veterans Administration and the VA Consolidated Mail Order Pharmacy ("CMOP").

**D. ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS FOR THE OFF-LABEL TREATMENT OF POST-TRAUMATIC STRESS DISORDER AND INTERMITTENT EXPLOSIVE DISORDER**

122

335.    Abbott also promoted the Depakote® Products off-label for the treatment of post-traumatic stress disorder ("PTSD") and intermittent explosive disorder.  PTSD in particular became a focal point of Defendant Abbott's promotion to military hospitals like Camp Pendleton, at which the Abbott Sales Force promoted the Depakote® Products for the treatment of veterans returning from Iraq and Afghanistan.

336.    For example, the Abbott-approved speaker's slide deck used since at least 2003, discussed *infra* at paragraph 352, listed clinical studies supporting the use of the Depakote® Products to treat a number of psychiatric disorders, including PTSD and intermittent explosive disorder.  The speaker notes accompanying the approved slide deck listed the numerous conditions for which the Depakote® Products had been demonstrated to be effective.  Included in that list were PTSD and intermittent explosive disorder.

337.    As another example, Abbott developed a standing order entitled "Using Depakote As a Treatment to Control the Agitation Associated with Dementia," which was prepared by an Abbott KOL named James Randy Mervis, M.D., whose associations included the UCLA School of Medicine, Geropsychiatry Consultation Services, and the Sepulveda Veterans Administration Medical Center.   The standing order recommended the use of Depakote® for the off-label treatment of intermittent explosive disorder, PTSD, and uncontrolled extreme anxiety and panic. The Mervis standing order was placed in patient records at long-term care facilities, and encouraged the off-label use of Depakote® for the treatment of PTSD and intermittent explosive disorder.

338.    However, an Abbott-sponsored study had previously demonstrated no benefit of the use of Depakote® for the treatment of patients with both intermittent explosive disorder and PTSD, and actually concluded that "there was no significant treatment difference between

123

divalproex and placebo" in the treatment of either condition. *See* Hollander, *et al.*, *Divalproex in the Treatment of Impulsive Aggression: Efficacy in Cluster B Personality Disorders*, 28 NEUROPSYCHOPHARMACOLOGY 1186 (2003). The results were presented "in part" by Dr. Hollander at a conference of the American Psychiatric Association in Philadelphia, Pennsylvania on May 18-23, 2002. Despite the negative Hollander Study, Abbott continued to promote the use of the Depakote® Products for the treatment of PTSD and intermittent explosive disorder.

339.     Another Abbott-sponsored study showed no benefit of Depakote® for the treatment of patients with PTSD and actually concluded that Depakote® "may actually lack efficacy in this population." While the results were completed in 2000 or 2001, they were not presented until 2004, when Dr. Mark B. Hamner did so in a poster session at a meeting of the New Clinical Drug Evaluation Unit sponsored by the National Institute of Mental Health. It was an additional five years before the Abbott-funded study was finally published. *See* Hamner, *et al.*, *A preliminary controlled trial of divalproex in posttraumatic stress disorder*, 21 ANNALS OF CLINICAL PSYCHIATRY 89 (2009). Despite the negative results of the Hamner Study, Abbott continued to promote the use of the Depakote® Products for the treatment of PTSD.

### E.     OFF-LABEL PROMOTION OF THE DEPAKOTE® PRODUCTS IN THE TREATMENT OF PSYCHIATRIC CONDITIONS IN CHILDREN AND ADOLESCENTS

340.     None of the Depakote® Products is, or has been, approved for any psychiatric indication in the treatment of children or adolescents. The only FDA-approved pediatric indication is for the treatment of seizures (Depakote Sprinkles® and Depakote ER®). Abbott never got the FDA indication for pediatric bipolar disorder. Nonetheless, Abbott engaged in widespread promotion of the Depakote Products® for the treatment of psychiatric conditions in this particularly vulnerable population.

124

341.    Research shows that Depakote® was widely used off-label to treat psychiatric conditions in children and adolescents. Zito, *et al.*, have documented the widespread use of anticonvulsants, including Depakote®, for the off-label treatment of numerous psychiatric conditions in youth. *See Zito, et al., Anticonvulsant Treatment for Psychiatric and Seizure Indications Among Youths*, 57 PSYCHIATRIC SERVICES 681 (2006). The authors trace the off-label use of anticonvulsants for psychiatric indications in the Medicaid program of a Mid-Atlantic state. According to their findings, of the youths receiving an anticonvulsant, some 67.7 percent had only a psychiatric diagnosis. Of the anticonvulsants prescribed to youths, some 61 percent of the prescriptions were for Depakote®.

342.    Despite little clinical support for such widespread use, there have been numerous reported adverse events in the use of the Depakote® Products to treat children and adolescents. Since the Depakote® Products were introduced in 1983, through 2007, there were 2164 adverse events reported to the FDA regarding the use of the Depakote® Products to treat children and adolescents. 1449 of these were categorized as "serious"; some 67 reported deaths.

343.    Abbott widely promoted the use of Depakote® for the treatment of children and adolescents. For example, in May 2003, Abbott distributed a supplement from the PSYCHIATRIC TIMES magazine entitled "Bipolar Disorder & Impulsive Spectrum Letter," which included an article entitled "Bipolar Disorder in Pediatric Patients." This article was written by Mark P. Bowes, Ph.D, a writer for CME, Inc., Irvine, California, with "support by an unrestricted educational grant from Abbott Laboratories." According to the supplement, "accumulating evidence suggests anticonvulsants [like Depakote®] are also effective in pediatric patients."

344.    And, Abbott engaged CENE ("Council for Excellence in Neuroscience Education"), a division of Access-Medical, to provide interactive CME programs for

125

psychiatrists and neurologists on the use of the Depakote® Products to treat children and adolescents. One such CENE program entitled "Treatment of Children and Adolescents with Bipolar Disorder" was presented in as a videoconference in 2001 by Dr. Robert A. Kowatch, Departments of Psychiatry Children's Hospital Medical Center of Cincinnati, University of Cincinnati Medical Center, concerning the use of the Depakote® Products to treat child/adolescent bipolar disorder. The program was supported by an Abbott unrestricted educational grant, and (relying on Donovan et al, *Am J Psychiatry* 2000, an open-label study of only 20 patients), recommends the off-label use of the Depakote® Products first-line to treat pediatric mania with psychosis. The CENE program is still available on www.cene.com.

345.    And, Abbott funded CME monographs, which promoted off-label uses of the Depakote® Products for the treatment of children and adolescents. One CME monograph was entitled "Child and Adolescent Bipolar Disorder: Focus on Differential Diagnosis and Management," sponsored by Access-Medical Group, Arlington Heights, Illinois and funded through an unrestricted educational grant from Abbott. The editors of the monograph were Dr. Karen Dineen Wagner, M.D., Ph.D. and Robert A. Kowatch, M.D., both Abbott consultants. The monograph was published on December 1, 2001, and included two hours of CME credit. Among the topics included in the monograph were the off-label use of Depakote® as the first-line agent to treat adolescent bipolar disorder, mixed mania, and/or rapid cycling. The monograph was (and still is) available through www.cene.com.

### F.    ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS FOR THE OFF-LABEL TREATMENT OF BORDERLINE PERSONALITY DISORDER

346.    Abbott regularly promoted the Depakote® Products for the treatment of borderline personality disorder ("BPD"), a serious mental illness characterized by pervasive instability in moods, interpersonal relationships, self-image, and behavior.

126

347.    For example, in 1999, through an unrestricted educational grant, Abbott

sponsored a CME Supplement in the JOURNAL OF CLINICAL PSYCHIATRY, which included a

presentation by Dr. Eric Hollander entitled "Managing Aggressive Behavior in Patients With

Obsessive-Compulsive Disorder and Borderline Personality Disorder." In his presentation, Dr.

Hollander discussed the off-label use of Depakote® to treat BPD. Abbott provided this

Supplement to numerous health care professionals as part of its promotion of Depakote® for use

in the treatment of BPD, including to Dr. Raymond Dann, 160 N. Date Street, Escondido,

California 92025.

348.    In another instance of off-label promotion for treatment of BPD, Abbott

sponsored a 2004 speaker presentation by Dr. Hollander, then Associate Professor of Psychiatry

and Director of the Compulsive and Impulsive Disorders Program at Columbia University

College of Physicians and Surgeons, entitled "The Impulsive-Aggress Symptom Domain in

Personality Disorders." At the time, there were no on-label treatments for BPD. The

presentation highlighted Dr. Hollander's research into the off-label use of Depakote® for the

treatment of BPD.

349.    Abbott engaged CENE ("Council for Excellence in Neuroscience Education"), a

division of Access-Medical, to provide interactive CME programs for psychiatrists, neurologists,

and long-term care specialists on the use of the Depakote® Products to treat borderline

personality disorder. One such CENE program prepared by Anil Vootkur, Ph.D., a writer for

Access-Medical, and entitled "Impulsivity and Aggression," touted "preliminary evidence" that

Depakote® "may be effective" in the treatment of BPD. The presentation was posted on the

www.cene.com website in August 2001, and is still available on-line.

FILED UNDER SEAL
133788.00601/36035820v.6

350.     Additionally, Abbott's Medical Information Department regularly sent responses to Medical Education Requests, which included off-label information on the Depakote® Products in the treatment of borderline personality disorder.  For example, one letter sent to Carolyn Carter, RN, 1800 Valley River Road #101, Eugene, Oregon 97408, explained that agitated patients with a diagnosis of borderline personality disorder were "especially responsive to treatment" with Depakote®.  Another letter sent to Marilyn Elliott, RN, 209 East Foster Avenue, Coeur D'Alene, Idaho 83814, made a similar claim.

## G.     ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS FOR THE OFF-LABEL TREATMENT OF BIPOLAR DEPRESSION

351.     Abbott regularly promoted the Depakote® Products for the off-label treatment of bipolar depression.  Bipolar depression results in sadness, worry, sluggishness, agitation, feelings of inadequacy, loss of appetite or interest in life's pleasures, and social withdrawal.  Bipolar depression differs from major depression or unipolar depression in that it is comprised of a recurrent episode preceded by at least one manic or mixed episode, according to <u>Diagnostic Criteria from DSM-IV.</u>  Although the Depakote® Products were approved for the treatment of bipolar disorder, they are not and have never been approved for the treatment of bipolar depression.

352.     The Company regularly retained speakers who promoted Depakote® throughout the United States for the off-label treatment of bipolar depression.  For example, starting at least as early as January 2003, speakers were provided with an Abbott-approved slide deck entitled "Bipolar Depression:  Management With Depakote® (Divalproex Sodium)," to use in order to promote Depakote® off-label for the treatment of bipolar depression.  The speaker slide deck recommends Depakote® first-line for treatment of depression associated with bipolar I, for treatment of rapid cycling, and for treatment of mania, despite the absence of FDA approval for

128

every one of these indications. The Abbott-approved speaker slides, used throughout the United States, conclude by stating that Depakote® "is a reasonable consideration for the treatment of bipolar depression."

353. Moreover, in order to grow its bipolar depression market share, Abbott sales representatives were given thousands of reprints of an Abbott-funded study they distributed to health care professionals, which discussed the off-label use of Depakote® to treat bipolar depression and concluded that it "improves several dimensions of depression during maintenance treatment of bipolar I." Laszlo Gyulai, *et al., Maintenance Efficacy of Divalproex in the Prevention of Bipolar Depression*, 28 NEUROPSYCHOPHARMACOLOGY 1374 (2003). While Abbott's sales representatives used the Gyulai Study as part of their promotion of Depakote® for the off-label treatment of bipolar depression, the Study's findings were very limited (*i.e.,* the Gyulai Study had found only that Depakote® improved the probability of depressive relapse, but with no finding concerning efficacy). What Abbott's Sales Force did not discuss was that the Gyulai Study was actually only a re-analysis of data from an earlier failed trial Abbott had sponsored, which had found Depakote® worked no better than a placebo in the treatment of bipolar depression. *See* Bowden, *et al., A randomized, placebo-controlled 12-month trial of divalproex and lithium in treatment of outpatients with bipolar I disorder,* 57 ARCHIVES OF GENERAL PSYCHIATRY 481 (2000). Although the Bowden Study had shown no efficacy for using the Depakote® Products in the treatment of bipolar depression, the Gyulai Study misleadingly describes the Bowden Study as having presented "preliminary evidence that divalproex *ameliorated depressive morbidity."* Despite no evidence of efficacy, using the Gyulia Study's misleading results, Abbott's Sales Force promoted the Depakote® Products as an effective treatment for bipolar depression.

129

**H. ABBOTT PROMOTED THE DEPAKOTE® PRODUCTS FOR THE OFF-LABEL TREATMENT OF "SYMPTOMS OF MANIA"**

354. Abbott regularly promoted the Depakote® Products for the off-label treatment of symptoms of mania, particularly as the company became more and more concerned that its widespread off-label promotion scheme would be detected. Starting in or around 2004, sales representatives were instructed to move away from the overt promotion of off-label uses, and instead promote the off-label use of the Depakote® Products to treat the symptoms of mania. For example, in the detail piece used starting in May 2004, 04C-731-C753-1, sales representatives were to focus their details instead on the "signs of mania" including

- Increased energy, activity, and restlessness

- Extreme irritability or anger

- Racing thoughts or thoughts that jump from one idea to another

- Rapid speech

- Trouble concentrating and focusing

- Needing little sleep

- Unrealistic feeling of personal power to accomplish any task

- Provocative, aggressive, or risky behavior

355. An example of Abbott's promotion of Depakote® for the treatment of symptoms of mania was the 2004 Regional Business Plan for the Central Storm Region, which stated sales representatives were to promote Depakote® in treating manic symptoms by selling Depakote® as a substitute to atypical antipsychotics. Included was a specific plan to promote Depakote at department of corrections facilities as a treatment for the symptoms of mania.

130

356. Abbott continued to promote Depakote® for the treatment of symptoms of mania in spite of countervailing evidence from a 2001 study that Abbott itself had commissioned, which had found that Depakote® may not have even been an effective treatment for symptoms of mania. *See* Tariot, *et al.*, *Safety and Tolerability of Divalproex Sodium in the Treatment of Signs and Symptoms of Mania in Elderly Patients with Dementia: Results of a Double-Blind, Placebo-Controlled Trial*, 62 CURRENT THERAPEUTIC RESEARCH 51 (2001). The 2001 Tariot study found that Depakote® "did not improve signs and symptoms of mania associated with dementia."

## I. ABBOTT PROMOTED DEPAKOTE ER® FOR USES ONLY DEPAKOTE® HAD RECEIVED

357. Abbott regularly promoted Depakote ER® for uses only Depakote® had received from the FDA. Depakote ER® was first approved by the FDA for marketing on August 4, 2000 only for the treatment of migraines. Depakote ER® was later approved for treatment of epilepsy, and for use in children and adolescents ages 10 to 17 on August 14, 2003, and then later for bipolar disorder on December 6, 2005. Despite the fact that Depakote ER® had only limited approvals when it was first approved, Abbott regularly promoted switches of patients to Depakote ER® for all conditions for which DR had been approved.

358. Abbott regularly hired paid speakers who touted Depakote ER® for uses to treat bipolar disorder when it had no such approval. For example, starting at least as early as January 2003, speakers were provided with an Abbott-approved slide deck entitled "The Evolution of Depakote and Depakote ER," which openly touted Depakote ER® for the treatment of bipolar disorder even though ER would not receive this approval until 2005. Speakers were to explain how switching to ER for the treatment of bipolar disorder actually *improved* patient adherence and efficacy, even though the FDA had not approved such use. The slide deck concludes with

131

the statement that Depakote ER® had a "Potential Role" in the treatment of bipolar disorder. The only cited bases for these claims were two open-label studies.

359. Abbott promoted the use of Depakote ER® for uses it had not received through the wide circulation of off-label journal supplements. For example, in May 2003, Abbott distributed a supplement it had sponsored in PSYCHIATRIC TIMES magazine entitled "Bipolar Disorder & Impulsive Spectrum Letter," which included an article entitled *Considering Safety and Tolerability of Treatment of Bipolar Mania.* This article was written by Barbara Boughton, a writer hired by CME, Inc., and discusses the Horne, *et al.* study, *Safety and efficacy of switching patients from a delayed-release to an extended-release formulation of divalproex,* JOURNAL OF CLINICAL PSYCHOPHARMACOLOGY, 176 (2003), in which patients were switched from Depakote® to Depakote ER® for the treatment of bipolar disorder, major depression, schizophrenia, Alzheimer's disease, dementia or intermittent explosive disorder. The supplement states that the Horne study found that ER had "significantly" fewer adverse events in treating these conditions.

360. Additionally, Abbott sponsored CME events designed to feature the Horne study findings, which promoted the off-label conversion to Depakote ER® for uses it did not have. For example, in August 2003 Abbott sponsored a CME through ABcomm entitled "The Safety and Efficacy of an Extended-Release Mood Stabilizer in the Psychiatric Patient." The expiration date for the CME was August 2006. During the CME, Dr. Horne is interviewed concerning the use of time-released medications to treat psychiatric conditions, particularly Depakote ER®. Dr. Horne discusses his "recommendation" for switching from DR to ER formulations, and that "every [DR] patient is a candidate to be switched." The Conclusion of the CME was that

132

"[e]xtended-release divalproex has been shown to be as efficacious as delayed-release divalproex with a lower incidence of side effects."

## XII.   THE INSTITUTIONAL DEFENDANTS' FRAUDULENT SCHEME

361.   At all relevant times, Omnicare and PharMerica knew that the Depakote® Products were and are being paid for/reimbursed by Federal Programs (including Medicaid and Medicare), and by all of the *Qui Tam* States.

362.   When Omnicare and PharMerica decided to employ these illegal marketing practices, they knew or should have known that physicians, pharmacists, and federally-funded health programs would routinely and necessarily file claims with Federal Programs for reimbursement for the Depakote® Products even though they were not eligible for such reimbursements.

363.   But for Omnicare's and PharMerica's illegal activities, these off-label and misbranded prescriptions for the Depakote® Products would not have been written. As a result, Omnicare and PharMerica submitted and/or caused the submission of false claims to Federal Programs for reimbursement of the Depakote® Products.

364.   Omnicare and PharMerica were beneficiaries of these false claims for reimbursement of the Depakote® Products prescriptions.

### A.   OMNICARE AND PHARMERICA'S GOVERNMENT BUSINESS

365.   Omnicare and PharMerica, the "Institutional Pharmacy Defendants," provide prescription drugs for thousands of elderly, disabled, mentally retarded, and developmentally disabled individuals whose benefits are paid by government programs. The Institutional Pharmacy Defendants receive millions of dollars annually as reimbursement for these drugs from

133

these government programs (including, but not limited to, Medicaid, Medicare (including through Medicare Prescription Drug Plans ("PDPs"), CHAMPUS/TriCare, and FEHBP).

366.    At all times relevant to this action, the Institutional Pharmacy Defendants were primarily engaged in providing pharmaceutical services to nursing homes and other LTC facilities through regional pharmaceutical centers throughout the United States.  Many of their pharmaceutical services are provided under contractual agreements with the *Qui Tam* States through their Medicaid provider licensure program, whereby the Institutional Pharmacy Defendants agree to provide pharmaceuticals to the *Qui Tam* States' Medicaid patients in the nursing homes and other LTC facilities that they serve, and the *Qui Tam* States would reimburse Omnicare and PharMerica their costs plus a fixed dispensing fee meant to provide the Institutional Pharmacy Defendants with a profit for providing services to Medicaid patients.

367.    As to Medicaid claims, at least once per day, the Institutional Pharmacy Defendants submit their Medicaid claims for reimbursement by "batching them" and submitting them electronically to the *Qui Tam* States.   These claims include the claims for off-label prescriptions for the Depakote® Products, as well as claims tainted by illegal kickbacks.  As such, the Institutional Pharmacy Defendants make false representations and false claims directly to the *Qui* Tam States concerning Medicaid reimbursement on a daily basis.

368.    As part of each electronic claim, the Institutional Pharmacy Defendants affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that (as Medicaid providers) they are in compliance with all applicable federal and state laws.

369.    The Institutional Pharmacy Defendants are reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

134

FILED UNDER SEAL
133788.00601/36035820v.6

370.    The Institutional Pharmacy Defendants' practices of making false claims to the government are based on policies issued by Omnicare's and PharMerica's corporate headquarters and offices throughout the country.

371.    The *Qui Tam* States are not financially responsible for paying one-hundred percent of the Institutional Pharmacy Defendants' claims for reimbursement. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily low-income and disabled persons. The federal involvement in Medicaid includes providing matching funds and ensuring that the states comply with minimum standards in the administration of the program. The federal share of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on each individual state's per capita income compared to the national average. Among the states, the FMAP is at least 50 percent, and in some instances, as high as 77 percent. For example, for fiscal year 2004, in Virginia, Massachusetts and Illinois, the federal share is 50 percent. *See* http://aspe.hhs.gov/health/fmap.htm (last checked January 15, 2010).

372.    Through the FMAP process, State Medicaid administrators obtain the federal government's share of the Institutional Pharmacy Defendants' reimbursements by submitting a quarterly Form 64 to CMS. For this reason, claims submitted to state Medicaid agencies, including those in the *Qui Tam* States, are presented to the federal government within the meaning of the FCA.

373.    The federal government pays Medicaid claims through a continuing line of credit certified by the Secretary of the Treasury in favor of the state payee. 42 C.F.R. § 430.30(d)(3), (4). The federal government authorizes the state payee "to draw Federal funds as needed to pay the Federal share of disbursements." 42 C.F.R. § 430.30(d)(3). The state can draw down on

135